CADY, Chief Justice.
In this case, we must decide whether a provision in a written parole agreement that authorizes a parole officer or law enforcement officer to conduct a warrantless, suspicionless search of a parolee and the home, vehicle, and belongings of the parolee satisfies, by itself, the consent exception to the reasonableness and warrant requirements of the search and seizure clause of the Iowa Constitution. We conclude a parole agreement does not satisfy the consent exception, and we reverse the judgment and sentence of the district court. We remand the case for a new trial.
I. Background Facts and Proceedings.
Isaac Baldón III was sentenced in 2003 to a term of incarceration with the state penal system following convictions for possession of controlled substances with intent to deliver and possession of a firearm by a felon. He was granted parole on October 20, 2008. On November 3, 2008, Baldón and his parole officer, Kevin Peterson, signed a parole agreement that contained seventeen standard conditions of parole and five special terms of parole. One standard condition, paragraph P, provided that Baldón would submit his “person, property, place of residence, vehicle, personal effects to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any parole officer or law enforcement officer.” The parole order directed that Baldón would not be released on parole until he signed the agreement.
To combat recidivist probationers and parolees, the Bettendorf Police Department commonly relied on paragraph P of the standard terms of a parole agreement to conduct searches of parolees in the city. Its officers were made aware of the consent-search provision and received training in conducting parolee searches.
More specifically, Bettendorf police officers implemented a protocol to check the Traveler Motel in Bettendorf several times each day as part of a routine patrol. The motel was known by the police department as perhaps the single highest crime location in Bettendorf. The Bettendorf Police Department has made numerous arrests at the motel, a total of 110 in 2007 alone. Most of the arrestees were probationers and parolees. The arrests most frequently involved drug offenses, prostitution, gun offenses, and auto theft.
Under the search protocol for the motel, the patrolling officer checks the license plate numbers of every vehicle in the parking lot to locate parolees or probationers. If a vehicle in the lot belongs to a parolee, the officer contacts the parolee’s parole officer, either to obtain consent to search *788 the parolee or to invite the parole officer to join the police officer in a search of the parolee. Both the police department and the parole officers are accustomed to using paragraph P as a basis to search parolees, either without suspicion or suspicion based on the high-crime nature of the area. The officer then contacts the front desk attendant of the motel to ascertain whether the parolee is checked into the motel and, if so, to obtain the room number.
At approximately 8:30 a.m. on May 25, 2009, Officer Dennis Tripp followed this protocol during his patrol of the Traveler Motel. The license plate check of a 1996 Oldsmobile showed it was registered to Baldón. Upon learning this, Officer Tripp called the shift commander, Sergeant Piazza, and asked him to contact parole officer Kevin Peterson.
Pursuant to the protocol, Sergeant Piazza informed Peterson that Baldón was at the motel. He also asked Peterson for permission to have Officer Tripp search the motel room and vehicle. Peterson gave his permission to search Baldón, but indicated he would like to be involved in the search and would promptly meet the police officers at the motel. Tripp learned Baldón was staying in room 29.
When Peterson arrived, Officer Tripp had been joined by Sergeant Piazza and another Bettendorf police officer. The officers collectively approached room 29 and knocked on the door. Eventually, Baldón opened the door. A young woman, later revealed to be a minor, was observed sitting on the bed. Peterson greeted Baldón and explained that the parole agreement authorized the officers to conduct a search of the motel room and Baldon’s vehicle.
The search of the motel room and Bal-don’s person yielded no incriminating evidence. Officer Tripp then took Baldon’s car keys and searched Baldon’s car. He discovered a large quantity of marijuana. After Tripp read Baldón his Miranda rights at the police station, Baldón confessed he had received the marijuana in satisfaction of a debt. The State charged Baldón with possession of a schedule I controlled substance with intent to deliver, second or subsequent offense, under Iowa Code sections 124.411 and 902.8 (2009) and possession of an amount of marijuana greater than 42.5 grams in violation of Iowa Code chapter 453B.
Baldón moved to suppress the marijuana seized from the search of his vehicle under both the Iowa and Federal Constitutions. He claimed the entry into his motel room and vehicle violated the Search and Seizure Clauses of both the Iowa and Federal Constitutions because paragraph P of the parole agreement constituted involuntary consent. The State argued the search was reasonable because Baldón consented to the searches by signing the parole agreement. It asserted Baldón was still serving his sentence while on parole and whatever expectation of privacy he may have had while on parole had been waived. At the hearing on the suppression motion, Officer Tripp testified he conducted the search based only on the agreement. He testified there had been no complaints involving Baldón at the motel. Peterson, the parole officer, agreed the search was “completely based on [the] agreement and nothing more.”
The district court denied Baldoris motion to suppress. It found Baldón consented to the search by signing the parole agreement and that the consent made the search reasonable. It also found Baldón waived any claim of privacy.
Baldón then waived his right to a trial by a jury, and the court found him guilty of the charges. Following the imposition of sentence, Baldón appealed.
*789 II. Scope and Standard of Review.
“We review claims the district court failed to suppress evidence obtained in violation of the federal and state constitutions de novo.” State v. Dewitt, 811 N.W.2d 460, 467 (Iowa 2012). When presented with such a claim, “ ‘we make an independent evaluation [based on] the totality of the circumstances as shown by the entire record.’ ” State v. Kurth, 813 N.W.2d 270, 272 (Iowa 2012) (quoting State v. Krogmann, 804 N.W.2d 518, 522-23 (Iowa 2011)). “ ‘Each case must be evaluated in light of its unique circumstances.’ ” Id. (quoting Krogmann, 804 N.W.2d at 523).
III. Issue Presented.
The fighting issue presented to the district court in response to the motion to suppress was whether Baldón consented to the search by signing the parole agreement. Although the State also seemed to argue more generally before the district court that suspicionless searches of parolees did not violate the Search and Seizure Clause of either the Iowa or Federal Constitution because parolees have a diminished expectation of privacy, it never argued the State had reasonable suspicion or other reasonable grounds to conduct the search of Baldón apart from consent. While the record is sketchy, the diminished-expectation-of-privacy argument was, instead, tied to the State’s consent claim to support the proposition that Baldón was aware he had little expectation of privacy after he signed the parole agreement.
On appeal, the State reiterated its claim of consent. Alternatively, however, the State argued the search was reasonable under a general search-and-seizure analysis because Baldon’s minimal expectation of privacy was outweighed by the interests of society in managing parolees and preventing recidivism, as well as reasonable suspicion.
We find the State waived the general reasonableness argument by not presenting it to the district court in a manner that would have allowed the court to fully and properly address it. See State v. Ochoa, 792 N.W.2d 260, 291 (Iowa 2010) (recognizing that an argument not made on an issue before the district court is waived). First, the State made no argument that special governmental needs justified the search.. Thus, we have no opportunity to consider in this appeal whether the State’s maintenance of a parole system presents “special needs[] beyond the normal need for law enforcement, [which] make the warrant and probable-cause requirement impractical.” See New Jersey v. T.L.O., 469 U.S. 325, 351, 105 S.Ct. 733, 748, 83 L.Ed.2d 720, 741 (1985) (Blackmun, J., concurring); see also Griffin v. Wisconsin, 483 U.S. 868, 875, 107 S.Ct. 3164, 3169, 97 L.Ed.2d 709, 718 (1987) (holding that Wisconsin’s operation of a probation system constitutes a special need beyond the normal need for law enforcement).
Second, the State made no argument to the district court that a balancing test under article I, section 8 would weigh in favor of the State in this case. For sure, the evidence at the suppression hearing was directed at Baldon’s parole status and putative consent as the basis for the search. See Ochoa, 792 N.W.2d at 291 (holding that parole status alone is insufficient to justify search of a parolee). The State did not introduce evidence of any particular need for the parole officer to search Baldón, either predicated on individual suspicion, background information particular to Baldón that would have been known to the parole officer, or the general mission of parole. Thus, the only issue we address on appeal is whether a parole agreement containing a consent-to-search *790 clause renders suspicionless and warrant-less searches of parolees reasonable under the search and seizure clause of the Iowa Constitution.
Additionally, we only analyze the consent issue in this case on state constitutional law grounds. The United States Supreme Court has not yet directly weighed in on the issue to direct an outcome under the Fourth Amendment or to aid us in our resolution under our state constitution. See Samson v. California, 547 U.S. 843, 852 n. 3, 126 S.Ct. 2193, 2199 n. 3, 165 L.Ed.2d 250, 259 n. 3 (2006) (declining to consider whether a search provision in a parole agreement generated under California law constituted consent). Of course, it is beyond dispute that the drafters of both our federal and state constitutions took the right to be free from unreasonable, warrantless searches seriously. See generally Ochoa, 792 N.W.2d at 269-75 (explaining events surrounding the drafting and ratification of the Federal and Iowa Constitutions). Yet, we need not comb for textual differences between the Fourth Amendment and article I, section 8 to determine if different results might be achieved under the two constitutions because the case only concerns the relatively humble inquiry of whether an alleged grant of consent for police to conduct war-rantless, suspicionless searches pursuant to a parole agreement is voluntary in the constitutional magnitude of the word “voluntary.” Thus, our decision hinges on the meaning and spirit of consent to justify the government’s intrusion without regard to the constitution.
Moreover, consent is an exception to the requirements of both the Iowa and Federal Constitutions, and it would be inconsistent with our judicial role under the circumstances to eschew our state constitution and interpret the issue under the Federal Constitution unless relief would not be available to a claimant under our state constitution. As Justice William Brennan sagely declared in his call to arms for state courts:
Federalism need not be a mean-spirited doctrine that serves only to limit the scope of human liberty. Rather, it must necessarily be furthered significantly when state courts thrust themselves into a position of prominence in the struggle to protect the people of our nation from governmental intrusions on their freedoms.
William J. Brennan Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L.Rev. 489, 503 (1977). More directly, we must remember that, at all times, “[t]he Iowa Constitution is the cornerstone of governing in Iowa.” Varnum v. Brien, 763 N.W.2d 862, 875 (Iowa 2009).
In the final analysis, our right under principles of federalism to stand as the final word on the Iowa Constitution is settled, long-standing, and good law. See Ochoa, 792 N.W.2d at 281-86, 287-91 (rejecting the United States Supreme Court’s interpretation of the Fourth Amendment as permitting warrantless, suspicionless searches of parolees based on parole status alone); Bierkamp v. Rogers, 293 N.W.2d 577, 579 (Iowa 1980) (“The result reached by the United States Supreme Court in construing the federal constitution is persuasive, but not binding upon this court in construing analogous provisions in our state constitution.”); State v. Tonn, 195 Iowa 94, 104-05, 191 N.W. 530, 535-36 (1923) (rejecting the exclusionary rule adopted by the United States Supreme Court for seizures of evidence by federal agents); see also Minnesota v. Nat’l Tea Co., 309 U.S. 551, 557, 60 S.Ct. 676, 679, 84 L.Ed. 920, 924 (1940) (“It is fundamental that state courts be left free and unfettered by us in interpreting their state con *791 stitutions.”)- As more fully elucidated by the concurring opinion, state constitutions have been a crucial font of equality, civil rights, and civil liberties from the incipience of our republic. Thus, the Supreme Court’s jurisprudence regarding the freedom from unreasonable searches and seizures under the Fourth Amendment — or any other fundamental, civil, or human right for that matter — makes for an admirable floor, but it is certainly not a ceiling.[1] Traylor v. State, 596 So.2d 957, 961-63 (Fla.1992).
With this background in mind, we proceed with what we now recognize as the Tonn-Ochoa analysis.
IV. Discussion.
It is well-settled that warrantless searches are virtually “ ‘per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.’” Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967)); accord State v. Naujoks, 637 N.W.2d 101, 107 (Iowa 2001). One recognized exception to the warrant requirement of our constitution is consent. State v. Reinier, 628 N.W.2d 460, 464-65 (Iowa 2001) (citing Schneckloth, 412 U.S. at 219, 93 S.Ct. at 2043-44, 36 L.Ed.2d at 858). Under this exception, the reasonableness requirement of the Search and Seizure Clause is satisfied when an individual consents to a search. See Katz, 389 U.S. at 358 n. 22, 88 S.Ct. at 515 n. 22, 19 L.Ed.2d at 586 n. 22. The consent establishes a waiver of rights under the Search and Seizure Clause. Thus, the question before us narrows to whether the parole agreement in this case establishes consent.
The nature of contracts supports the general proposition that consent to a search can be prospectively given pursuant to a contract. See Zap v. United States, 328 U.S. 624, 628-29, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477, 1482 (1946), judgment vacated by 330 U.S. 800, 67 S.Ct. 857, 91. L.Ed. 1259 (1947). In other words, a person can contract away the constitutional right to be free from unconstitutional searches. See id.
In Zap, an aeronautical engineer entered into a contract with the Department of the Navy to perform experimental work involving test flights of airplanes. Id. at 626, 66 S.Ct. at 1278, 90 L.Ed. at 1480. Under one of the terms of the contract, the engineer specifically agreed to permit the government to search the account and billing records of his business during the term of the contract. Id. at 627, 66 S.Ct. at 1279, 90 L.Ed. at 1481. A subsequent search of the records by the government *792 conducted pursuant to the contract led to fraud charges against the engineer. Id. at 627, 628, 66 S.Ct. at 1279, 90 L.Ed. at 1481. In the course of the prosecution of the charges, the government defended the warrantless search when challenged by the engineer on grounds that the engineer waived his Fourth Amendment rights by entering into the contract. Id. at 628, 66 S.Ct. at 1279, 90 L.Ed. at 1481. The Court held the search was valid on two levels: First, it found the contract constituted a valid advance waiver of his privacy rights because he agreed to permit the search “in order to obtain the government’s business.” Id. at 628, 66 S.Ct. at 1279, 90 L.Ed. at 1482. Second, the search itself was not carried out in an unreasonable manner, but was done during regular business hours and without any threats or force. Id.
When consent in any form is used to support a search, the concern of the Search and Seizure Clause is that the consent be real and not a “pretext for the unjustified police .intrusion against which the Fourth Amendment is directed.” Schneckloth, 412 U.S. at 228, 98 S.Ct. at 2048, 36 L.Ed.2d at 863. Thus, our concern when presented with a search-and-seizure claim in the context of contractual consent is that the consent promised under the contract be voluntary. Cf. id. at 227, 93 S.Ct. at 2047-48, 36 L.Ed.2d at 862-63.
Generally, contract terms are considered to be consensual or voluntary for the same basic reason that courts normally enforce contracts. Conceptually, courts enforce contracts because they are a product of the free will of the parties who, within limits, are permitted to define their own obligations. The consent found within a contract is made evident by the bargain exchanged by the parties. In Zap, the bargained-for exchange was enough, as with most contracts, to support the consent of its terms. The engineer gave up his constitutional right to be free from warrantless and suspicionless government searches in return for obtaining government business. Zap, 328 U.S. at 628, 66 S.Ct. at 1279, 90 L.Ed. at 1482.
The United States Supreme Court has not addressed the specific question whether a parole agreement executed by a parolee constitutes valid consent to support a waiver of Fourth Amendment rights. See Samson, 547 U.S. at 852 n. 3, 126 S.Ct. at 2199 n. 3, 165 L.Ed.2d at 259 n. 3 (“Because we find that the search at issue here is reasonable under our general Fourth Amendment approach, we need not reach the issue whether ‘acceptance of the search condition constituted consent in the Schneckloth ... sense of a complete waiver of his Fourth Amendment rights.’ ” (quoting United States v. Knights, 534 U.S. 112, 118, 122 S.Ct. 587, 591, 151 L.Ed.2d 497, 504-05 (2001))). See generally Griffin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (holding a search of a probationer’s home pursuant to a Wisconsin probation regulation was permissible under a special needs theory, but not addressing whether the probationer had consented to the search under the regulation). We too have not previously decided the question under the Iowa Constitution. See Ochoa, 792 N.W.2d at 291.
Many courts across the nation have concluded that consent-search provisions in probation agreements constitute a waiver of search-and-seizure rights. See United States v. Barnett, 415 F.3d 690, 691-92 (7th Cir.2005) (finding consent-search provision in a probation agreement was voluntary); State v. Montgomery, 115 Ariz. 583, 566 P.2d 1329, 1330-31 (1977) (holding probationer voluntarily accepted consent-search provision by accepting probation); People v. Bravo, 43 Cal.3d 600, 238 Cal.Rptr. 282, 738 P.2d 336, 341 (1987) (“A *793 probationer, unlike a parolee, consents to the waiver of his Fourth Amendment rights in exchange for the opportunity to avoid service of a state prison term.”); People v. Mason, 5 Cal.3d 759, 97 Cal.Rptr. 302, 488 P.2d 630, 634 (1971) (holding probationer may waive claims to privacy by agreeing in advance to permit searches at any time); Allen v. State, 258 Ga. 424, 369 S.E.2d 909, 910 (1988) (finding consent-search provision as part of probation was voluntarily obtained during plea negotiations); State v. Gawron, 112 Idaho 841, 736 P.2d 1295, 1297 (1987) (holding conditional release into society of probationer decreases expectation of privacy); State v. Devore, 134 Idaho 344, 2 P.3d 153, 156 (2000) (discussing a probationer’s ability to prospectively consent to warrantless, suspicionless searches in the probation agreement); People v. Absher, 242 Ill.2d 77, 351 Ill.Dec. 163, 950 N.E.2d 659, 664-68 (2011) (holding defendant contractually agreed to intensive probation to avoid prison); Rivera v. State, 667 N.E.2d 764, 767 (Ind.Ct.App.1996) (holding defendant agreed to submit to searches as a condition of probation); People v. Hellenthal, 186 Mich.App. 484, 465 N.W.2d 329, 330 (1991) (“A probationer ... has given his consent in return for more lenient treatment.” (quoting People v. Peterson, 62 Mich.App. 258, 233 N.W.2d 250, 257 (1975) (Danhof, J., concurring in part, dissenting in part))); State v. Anderson, 733 N.W.2d 128, 139 (Minn.2007) (holding acceptance of probation subject to a search condition “ ‘significantly diminished [Anderson’s] reasonable expectation of privacy’ ” (quoting Knights, 534 U.S. at 119-20, 122 S.Ct. at 591, 151 L.Ed.2d at 504)); State v. Morgan, 206 Neb. 818, 295 N.W.2d 285, 288-89 (1980) (holding that consent-search provision of a probation agreement was voluntary even though defendant would have been sent to prison if he rejected it); State v. Bollinger, 169 N.J.Super. 553, 405 A.2d 432, 438 (1979) (holding defendant gave “a valid and knowing consent to a search of his dwelling and automobile when he agreed [to the terms of probation]”); State v. Mitchell, 22 N.C.App. 663, 207 S.E.2d 263, 264 (1974) (holding a person may consent to warrant-less searches as a condition of a suspended sentence); State v. Davis, 191 S.W.3d 118, 122 (Tenn.Crim.App.2006) (“A probationer consents to the waiver of his Fourth Amendment rights in exchange for the opportunity to avoid incarceration.”); State v. Martinez, 811 P.2d 205, 209 (Utah Ct.App.1991) (holding probationer prospectively consents to searches by signing probation agreement); Anderson v. Commonwealth, 256 Va. 580, 507 S.E.2d 339, 341 (1998) (holding defendant’s agreement to consent-search provision not coerced merely because it was “one of two undesirable options”).
Some courts have concluded probationers do not voluntarily consent to these search provisions, however. See United States v. Consuelo-Gonzalez, 521 F.2d 259, 265 & n. 15 (9th Cir.1975) (rejecting an argument that the “contract theory” of parole could be applied to probationers so as to make “[sjubmission [to any search] the price of probation”); Grubbs v. State, 373 So.2d 905, 910 (Fla.1979) (holding condition of probation requiring probationer “to consent at any time to a warrantless search by a law enforcement officer” was unconstitutional); Commonwealth v. LaFrance, 402 Mass. 789, 525 N.E.2d 379, 381 n. 3 (1988) (“The coercive quality of the circumstance in which a defendant seeks to avoid incarceration by obtaining probation on certain conditions makes principles of voluntary waiver and consent generally inapplicable.”); Peterson, 233 N.W.2d at 255 (characterizing a search provision of a probation agreement as a “Bill of Attainder *794 for the period of probation” and holding that “when the waiver [was] conditioned on the surrender of so hallowed a right, the so-called choice amounted] to no choice at all [and] the probationer’s signed acceptance therefore was in legal effect coerced and thus rendered nugatory” (footnote omitted)); State v. Schlosser, 202 N.W.2d 136, 139 (N.D.1972) (holding search provision in probation order “constitute^] a reasonable and necessary element of [the court’s regulation of probationers,] which did not require the defendant’s consent”); Tamez v. State, 534 S.W.2d 686, 692 (Tex.Crim.App.1976) (holding probationer’s acceptance of search provision of parole agreement did not constitute “freely and voluntarily given” consent).
On the other hand, only a handful of courts have addressed the same question in the context of parole agreements that we face in this case, with mixed results. See United States ex rel. Coleman v. Smith, 395 F.Supp. 1155, 1157 (W.D.N.Y.1975) (holding consent-search provision in parole agreement was coerced and involuntary); Roman v. State, 570 P.2d 1235, 1241-42 (Alaska 1977) (holding released offenders do not voluntarily consent to all conditions of parole); People v. Reyes, 19 Cal.4th 743, 80 Cal.Rptr.2d 734, 968 P.2d 445, 448 (1998) (holding suspicionless searches of parolees cannot be justified by consent if prospective parolee does not have freedom to accept or reject parole); People v. McCullough, 6 P.3d 774, 781 (Colo.2000) (avoiding consent issue by relying on the special needs doctrine to justify a parolee search); People v. Wilson, 228 Ill.2d 35, 319 Ill.Dec. 353, 885 N.E.2d 1033, 1042 (2008) (adopting Samson instead of analyzing the parole agreement’s search condition under a consent framework); State v. Heaton, 812 N.W.2d 904, 908 (Minn.Ct.App.2012) (“By agreeing to [the search] condition of parole, appellant diminished his reasonable expectation of privacy.”); Himmage v. State, 88 Nev. 296, 496 P.2d 763, 765-66 (1972) (holding parolee voluntarily agreed to consent-search provision as a condition of release into society); People v. Huntley, 43 N.Y.2d 175, 401 N.Y.S.2d 31, 371 N.E.2d 794, 798 (1977) (holding the parolee’s signature on parole agreement “is not to be taken as an unrestricted consent to any and all searches whatsoever or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures”); Sullivan v. Bunting, 133 Ohio St.3d 31, 975 N.E.2d 999, 1001 (2012) (holding parolee consented to search of his e-mail based on the parole agreement); State v. Benton, 82 Ohio St.3d 316, 695 N.E.2d 757, 762 (1998) (holding parolee waives constitutional search-and-seizure rights by voluntarily signing parole agreement); Scott v. Pa. Bd. of Prob. & Parole, 548 Pa. 418, 698 A.2d 32, 36 (1997) (holding parolee’s right to be free from unreasonable searches and seizures was “unaffected by his signing of the consent to search provision”), rev’d on other grounds, 524 U.S. 357, 369, 118 S.Ct. 2014, 2022, 141 L.Ed.2d 344, 355 (1998); State v. Turner, 297 S.W.3d 155, 166 (Tenn.2009) (adopting Samson “where the parolee has agreed to warrantless searches by law enforcement officers”); State v. Velasquez, 612. P.2d 1254, 1260 & n. 4 (Utah 1983) (holding defendant does not waive Fourth Amendment protection by signing parole agreement, but the search condition does confirm right of parole officer to conduct reasonable searches within scope of parole mission); Pena v. State, 792 P.2d 1352, 1357-58 (Wyo.1990) (“[A] parolee’s signature on a parole agreement which permits warrantless searches as an acknowledgement that parole officers have the right to conduct reasonable searches.”); see also State v. Williams, 486 S.W.2d 468, 472 (Mo.1972) (“[Parolees] have accepted the *795 favor of parole subject to that degree of surveillance and search required under the circumstances for the effective supervision of the parolee and the protection of the public.”).
To begin our analysis, we largely set aside the cases dealing with probation agreements. These cases are of limited value in analyzing the consent issue in parole agreements because probationers often end up on probation through plea bargaining and, consequently, maintain a vastly superior bargaining power than parolees. Such a probationer has the choice of demanding a trial to seek his or her freedom, which many courts find gives rise to the type of bargaining power that renders probation agreements consensual. See Barnett, 415 F.3d at 692 (“Nothing is more common than an individual’s consenting to a search that would otherwise violate the Fourth Amendment, thinking that he will be better off than he would be by standing on his rights.”). Thus, we primarily focus on parolee cases.
More direct to the issue we must decide, our review of those cases that enforce consent provisions of a parole agreement largely undervalue the rights of parolees, rendering them inapposite for a helpful and tight analysis under Iowa law. See Ochoa, 792 N.W.2d at 287-91. For example, many of these cases simply follow Samson. See, e.g., Wilson, 319 Ill.Dec. 353, 885 N.E.2d at 1042 (applying Samson to a parole agreement with different language than the language at issue in Samson ); Turner, 297 S.W.3d at 166 (holding requirement that a prisoner agree to search condition of parole “is reasonable in light of the parolee’s significantly diminished privacy interests”). Like Samson, Wilson is not a true consent case; it simply uses a search condition in a parole agreement to decrease the parolee’s expectation of privacy to a nullity. See Wilson, 319 Ill.Dec. 353, 885 N.E.2d at 1042; see also Samson, 547 U.S. at 852 n. 3, 126 S.Ct. at 2199 n. 3, 165 L.Ed.2d at 259 n. 3. Similarly, although it preceded Samson, McCullough was not actually a consent case either, but rather a special needs case that essentially used the special needs doctrine to reach the result reached by Samson. See McCullough, 6 P.3d at 780-81. Likewise, Sullivan did not analyze the facts of the case for anything resembling voluntariness. See 975 N.E.2d at 1001. Neither did its jurisprudential progenitor, Benton. See 695 N.E.2d at 761. Rather, Benton simply concluded parolees may be subjected to suspicionless searches based on policy grounds largely related to the parolee’s status. See id. Our rejection of Samson in Ochoa leads us to reject these cases as well. See 792 N.W.2d at 287-91.
Additionally, two cases pique our concern that suspicionless consent searches of parolees also impact persons who live with parolees. See McFerrin v. State, 344 Ark. 671, 42 S.W.3d 529, 534-35 (2001) (holding parole officer could extract consent from parolee’s sister prior to parolee’s release); Devore, 2 P.3d at 156-57 & nn. 1, 2 (holding a search notification form requiring parolee’s roommates to submit to suspi-cionless searches created valid consent). Another case cogently explains the fear about these cases. Roman, 570 P.2d at 1241-42. The Roman court stated:
“Fourth amendment protection will be diminished not only for parolees, but also for the family and friends with whom the parolee might be living. Those bystanders may find themselves subject to warrantless searches only because they are good enough to shelter the parolee, and they may therefore be less willing to help him — a sadly ironic result in a system designed to encourage reintegration into society. Moreover, the demeaning effect of arbitrary intru *796 sions into the parolee’s privacy will be reflected in the attitudes of his relatives and friends. As a result, the parolee will suffer diminished feelings of self-worth, making his rehabilitation more difficult. In addition, warrantless parole officer searches may reinforce patterns of resentment to authority, and excessive external controls may inhibit the development of necessary internal controls: ⅛ person must have the freedom to be responsible if he is to become responsibly free.’ ”
Id. at 1243 (quoting Note, Striking the Balance Between Privacy and Supervision: The Fourth Amendment and Parole and Probation Searches of Parolees and Probationers, 51 N.Y.U. L. Rev. 800, 816-17 (1976) (footnotes omitted)). Roman actually rejected consent as a rationale for upholding searches of parolees, although it held limited searches of parolees were acceptable under another rationale. See id. at 1241-42, 1243-44. These collective observations give us pause to follow this line of authority.
Those courts in other states that have rejected consent derived from parole agreements as a theory for upholding searches of parolees do so on the basis that such a condition of parole is coercive and, therefore, involuntary. See, e.g., Coleman, 395 F.Supp. at 1157. These courts not only find the general surrounding circumstances tend to weigh against consent, particularly the custodial nature of the setting that produces parole, but also the limited choices available to a prisoner seeking parole. Id. The temptation of the “return to normalcy,” combined with the fact that the parolee’s choices are either to waive Fourth Amendment rights or to remain incarcerated, render the resulting agreement to waive all Fourth Amendment protection coercive and invalid. Id.; cf. Tamez, 534 S.W.2d at 692 (“The choice to reject probation and go to prison or accept probationary condition was really no choice at all. It was in effect coerced.”). This approach actually resembles the path we have already begun to forge.
We have previously recognized the absence of bargaining power by a parolee in a parole agreement. In State v. Cullison, we rejected the notion of using contract law to support a voluntary surrender of constitutional rights by a parolee on the basis that parole involves the situation in which the State “has all of the bargaining power,” which renders the contractual nature of an agreement illusory. 173 N.W.2d 533, 536-37 (Iowa 1970).[2]
The lack of free will by a parolee to support consent-search provisions of parole agreements was also recognized in the dissent in Samson, which we followed in Ochoa. In his dissent in Samson, Justice Stevens found the notion of parolee consent-to-search provisions to be “sophistry.” 547 U.S. at 863 n. 4, 126 S.Ct. at 2206 n. 4, 165 L.Ed.2d at 267 n. 4 (Stevens, J., dissenting). In truth, a parolee simply
has no “choice” concerning the search condition; he may either remain in prison, where he will be subjected to suspi-cionless searches, or he may exit prison and still be subject to suspicionless *797 searches. Accordingly, “to speak of consent in this context is to resort to a ‘manifest fiction,’ for ‘the [parolee] who purportedly waives his rights by accepting such a condition has little genuine option to refuse.’ ”
Id. (quoting 5 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.10(b), at 440-41 (4th ed. 2004)).
Similarly, Justice Kennedy recognized the weakness of using consent predicated on the acceptance of adverse consequences in his concurring opinion in Ferguson v. City of Charleston, 532 U.S. 67, 90-91, 121 S.Ct. 1281, 1295, 149 L.Ed.2d 205, 224 (2001) (Kennedy, J., concurring). While he disagreed with the majority’s analysis regarding the purported special needs justification of a practice by a public hospital to require pregnant mothers who displayed certain symptoms and characteristics to consent to drug testing, Justice Kennedy also spoke in his concurring opinion to the nature of the consent dictated by the hospital. See id. He wrote:
An essential, distinguishing feature of the special needs cases is that the person searched has consented, though the usual voluntariness analysis is altered because adverse consequences (e.g., dismissal from employment or disqualification from playing on a high school sports team) will follow from refusal. The person searched has given consent, as defined to take into account that the consent was not voluntary in the full sense of the word. The consent, and the circumstances in which it was given, bear upon the reasonableness of the whole special needs program.
Id. (citations omitted). Thus, both our prior precedent and a line of authority outside Iowa has revealed that a consent-to-search clause in a parole agreement would not necessarily satisfy the type of consent to qualify as an exception to the search-and-seizure requirement under our Iowa Constitution.
The academic community has also recognized weaknesses in treating consent searches as voluntary searches in the context of the grant of parole. Cf. David T. Reindl, Bargains or Unconstitutional Contracts? How Enforcement of Probation Orders as Contracts Could Take the Reasonableness Out of Probation Searches, 33 New Eng. J. on Crim. & Civ. Confinement 123, 145-51 (2007). A predominant factor in this observation is the government’s overwhelming bargaining power during negotiations tends to render these contracts essentially contracts of adhesion, with some particularly objectionable clauses and conditions of these contracts being both procedurally and substantively unconscionable. Id. at 149-51. Moreover, while the title of a legal document is not dispositive, a contractual theory may be especially inapplicable to parole conditions when, as in this case, they are part of a document that is itself entitled “Order.” See id. at 146. That caption or title properly captures the real character of the transaction. Indeed, it has been noted that, while power imbalance can be a key factor in determining the validity of a contract, it has been an important factor in the consent-to-search context since before Schneckloth. Christo Lassiter, Consent to Search by Ignorant People, 39 Tex. Tech L. Rev. 1171, 1189-91 (2007).
Professor LaFave has written extensively in this area and has concluded that a coercive atmosphere necessarily militates against finding that an ostensive consent is voluntary. 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(b), at 66, 81-90 (5th ed. 2012) [hereinafter LaFave]. The coercive atmosphere of physical detention in an official location is of the “greatest signifi- *798 canee.” Id. at 88. Professor LaFave concedes that “ ‘custody alone has never been enough in itself to demonstrate [coercion].’ ” Id. at 84-85 (quoting United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598, 609 (1976)). Nonetheless, LaFave emphasizes the distinction between cases in which the subject of the search was either “free to leave or was in familiar surroundings at the time” and cases in which the search subject was in custody. Id. at 89-90 (footnotes omitted). Indeed, LaFave suggests this distinction was pivotal to the outcome of Schneekloth itself, stating, “[T]he Supreme Court [in Schneekloth ] noted that, ‘since consent searches will normally occur on a person’s own familiar territory, the specter of incommunicado police interrogation in some remote station house is simply inappo-site.’ ” Id. at 89 (quoting Schneckloth, 412 U.S. at 247, 93 S.Ct. at 2058, 36 L.Ed.2d at 874).
LaFave’s recognition that “ ‘the location and conditions’ of even a brief detention may be such as to foreclose a finding of voluntary consent” is also instructive. Id. at 90 (footnote omitted) (quoting United States v. Worley, 193 F.3d 380, 387 (6th Cir.1999)). Even seemingly innocuous circumstances such as a brief stop in an airport
“make it easy for implicit threats or subtle coercion to exert tremendous pressure on an individual to acquiesce to the officer’s wishes. In such a situation it would be easy to misinterpret acquiescence to an officer’s demands as consent; acquiescence cannot, of course, substitute for free consent.”
Id. (quoting United States v. Berry, 670 F.2d 583, 596 (5th Cir.1982)). We have similarly recognized the potential for coercion even in brief roadside stops. See State v. Pals, 805 N.W.2d 767, 782-83 (Iowa 2011) (holding officer’s request for consent in the squad car without informing Pals he was free to leave or warning him regarding his right to refuse consent was coercive). In other words, coercion can easily find its way into human interaction when detention is involved.
LaFave has also traced the development of consent-to-search clauses in probation and parole agreements to the now discredited “act of grace” theory of parole. 5 LaFave § 10.10(b), at 527; see also Cullison, 173 N.W.2d at 536-37 (rejecting the “act of grace” theory of parole).[3] LaFave notes the effort to revive the “act of grace” theory can be traced to a 1967 article. 5 LaFave § 10.10(b), at 527. The article advised states to
“make the right to conduct a search and seizure ... an express condition of parole or probation, as the case may be, which the defendant knowingly accepts. Constitutional rights may be waived and if a court should hold that the Fourth Amendment is applicable in these instances, the rights could be waived in this manner.”
Id. (quoting Alexander Holtzoff, The Power of Probation and Parole Officers to Search and Seize, 31 Fed. Probation 3, 7 (1967)). As our own research indicates, LaFave observed that many courts con *799 fronted with these purported waivers of constitutional protections have approved of them. Id. at 529-30.
However, LaFave disagrees with these holdings. Id. at 580-31. A proper application of Schneckloth requires more than a superficial inquiry into the existence of a parole agreement containing a consent provision. Id. at 532. LaFave concludes by drawing a connection between Schneck-loth’s reliance on Fifth Amendment cases that analyze the voluntariness of a confession and
the long established rule that a confession is not voluntary when given in response to an assurance by the maker “that, by so doing, he might at least obtain a mitigation of the punishment for the crime which otherwise would assuredly follow.”
Id. (quoting Bram v. United States, 168 U.S. 532, 565, 18 S.Ct. 183, 195, 42 L.Ed. 568, 581 (1897)). He doubts whether such a “quid pro quo ... could pass muster under Schneckloth ” and opines this may be the very reason the United States Supreme Court has consistently analyzed searches of parolees and probationers on other grounds. Id.
Other commentators have argued that contractual thinking nonetheless has a place in constitutional search-and-seizure analysis, particularly when the government is not obligated to extend a certain privilege or benefit in the first place. William J. Stuntz, Implicit Bargains, Government Power, and the Fourth Amendment, 44 Stan. L. Rev. 553, 555 (1992) [hereinafter Stuntz]; see also Michael Chmelar, Contract Law and Its Potential Impact on Parole and Probation Searches, 28 N. Ill. U. L. Rev. 43, 54-56 (2007); cf. Kathleen M. Sullivan, Unconstitutional Conditions, 102 Harv. L. Rev. 1413, 1422 (1989) (“What government benefits give rise to unconstitutional conditions problems? Those benefits that government is permitted but not compelled to provide.... Unconstitutional conditions problems ... do not arise if government is obligated to provide a benefit.”). Yet, by analogy, while a government could argue it could decline to offer public housing altogether and thus should be able to require waiver of constitutional search-and-seizure protection as consideration for offering the public housing in the first place, this argument would be a “bluff,” given society’s acceptance of public housing. Stuntz, 44 Stan. L. Rev. at 568. It would not necessarily be a bluff if society did not value available options for affordable public housing. Id. The application of these principles to searches of parolees is somewhat difficult. On the one hand, granting parole decreases the government’s financial burden of operating a prison system. See id. at 580. Articulating stricter standards for searches of parolees, on the other hand, wmdd likely limit the number of prisoners granted such lighter treatment, as the costs of supervising probationers and parolees would also rise. Id. at 581. Thus, this consequence would ultimately have the effect of redistributing the loss of freedom from parolees subject to enhanced supervision techniques to increased numbers of prisoners whose grant of conditional freedom is either delayed or never granted. Id.
Another commentator has argued that the government could not in fact choose not to grant parole for at least some prisoners given that prisons, like other government departments, face budgetary restrictions. Antoine McNamara, Note, The “Special Needs" of Prison, Probation, and Parole, 82 N.Y.U. L. Rev. 209, 237 (2007) [hereinafter McNamara]. McNamara notes that a recent study found that not offering parole or probation would “more than triple the inmate population.” Id,, at *800 237 & n. 191 (citing Lauren E. Glaze & Seri Palla, U.S. Dep’t of Justice, Bureau of Statistics, Probation and Parole in the United States 1-2 (2005)). Therefore, contrary to Judge Posner’s assertion in Barnett that parolees and probationers “[give] up nothing” by agreeing to submit to war-rantless, suspicionless searches, see 415 F.3d at 692, the parolee or probationer actually gets nothing in return for waiving their constitutional search-and-seizure rights, McNamara, 82 N.Y.U. L. Rev. at 238.
Another article provides empirical data relevant to the other side of Schneckloth ⅛ policy balancing equation. In the context of waivers of Fourth Amendment rights by probationers, one article surveyed forty-one Wisconsin probation officers after the Supreme Court’s opinion in Griffin and found that a blanket waiver of search-and-seizure protections that “applies to all probationers is not necessary to adequately protect the public.” See Howard P. Schneiderman, Comment, Conflicting Perspectives from the Bench and the Field on Probationer Home Searches — Griffin v. Wisconsin Reconsidered, 1989 Wis. L. Rev. 607, 610, 655 (1989) (arguing that, although probation officers appreciate warrantless home searches, a low rate of frequency of home searches combined with probation officer dislike of home searches indicates that warrantless home searches are not necessary for the maintenance of Wisconsin’s probation system). Indeed, Schneid-erman acknowledges that Justice Scalia’s analogy to administrative searches may be apt in the context of home visits, but is inapposite in the context of “full-blown searches,” which are generally conducted when the parole officer believes that a parole violation or crime may be taking place. Id. at 656-57.
With all this in mind, we proceed to consider the voluntariness of a prospective consent-to-search provision in a parole agreement used to justify a search of a parolee. Importantly, the issue is not whether the government can or cannot conduct a search of a parolee. The narrow question before us is whether the government can conduct the search based solely on consent required to be given by parolees as a condition of release from prison.[4] Every search of a citizen by the government must be supported by some recognized ground or justification, and we must only decide if consent extracted from pris *801 oners as a condition of release on parole constitutes one such ground. We have no occasion in this case to consider other grounds available to the State to justify such a search.
Unlike the situation in Zap, the voluntary nature of the consent to search was not supported by the benefit of the bargain found on the face of the parole agreement in this case. We appreciate that the bargain under a contract can, at times, involve a choice between two unpalatable alternatives, which does not defeat the voluntariness of the consent. See Barnett, 415 F.Sd at 692 (declaring that a choice between accepting probation as a term of a plea bargain is more valuable than the risk of going to prison following a trial); Benton, 695 N.E.2d at 762 (rejecting an argument that defendant “had no choice but to sign a waiver as a condition of his parole, thereby implying that the waiver was not voluntary”); Anderson, 507 S.E.2d at 341 (holding grant of consent in a parole agreement was voluntary even though the terms of the agreement were “dictated by the Commonwealth” and the defendant signed “only to avoid time in jail”). However, this proposition does not mean a choice between two unpalatable alternatives can never be coercive. See Schneckloth, 412 U.S. at 224, 93 S.Ct. at 2046, 36 L.Ed.2d at 861 (“ ‘Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all incriminating statements — even those made under brutal treatment — are “voluntary” in the sense of representing a choice of alternatives.’ ” (quoting Paul M. Bator & James Vorenberg, Arrest, .Detention, Interrogation and Right to Counsel: Basic Problems and Legislative Solutions, 66 Colum. L. Rev. 62, 72 (1966))). Parole is simply one of those times when a choice to remain in prison with no constitutional rights involving search and seizure or to gain freedom with no constitutional rights involving search and seizure is simply “no choice at all.” Tamez, 534 S.W.2d at 692. When a constitutional right is at stake, more than a one-sided agreement is needed to establish waiver of the right.
The obligation of courts to examine the voluntariness of an agreement is nothing new and is supported by our law of contracts. For instance, we refuse to enforce unconscionable contracts. See Casey v. Lupkes, 286 N.W.2d 204, 207 (Iowa 1979) (recognizing unconscionability as a generally available contract defense); see also Restatement (Second) of Contracts § 208 (1981) (permitting a court to refuse to enforce all or part of a contract if the contract was unconscionable when formed). The doctrine is especially applicable to contracts of adhesion. See C & J Fertilizer, Inc. v. Allied Mut. Ins. Co., 227 N.W.2d 169, 179-81 (Iowa 1975). This refusal is based on a strong distaste for the enforcement of unjust terms between parties of grossly disproportionate bargaining power. As we quoted in a recent case:
“A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms.”
In re Marriage of Shanks, 758 N.W.2d 506, 515 (Iowa 2008) (quoting Restatement (Second) of Contracts § 208 cmt. d). This language accurately summarizes the nature of a consent-to-search provision in a parole agreement and reveals that the fail *802 ure to enforce search provisions is consistent with other occasions when we have refused to enforce terms of a contract that were, in all reality, not consensual.
A practical reality regarding the release of prisoners on parole bolsters our conclusion. Generally, a prisoner in the Iowa state penal system automatically earns one day of good-time credit for each day served. See Iowa Code § 903A.2(l)(a). Accordingly, the time when parole can be offered to an inmate is cut in half by good-time credits. Additionally, parole in most cases is offered much earlier. For example, according to a recent annual report from the board of parole, the average time served in prison prior to obtaining parole on a conviction for possession of marijuana with intent to distribute was only eighteen months, not ten years. Iowa Board of Parole, Annual Report for State Fiscal Year 2011 (2012), at 18 tbl. 6. The average time served prior to the grant of parole for failure to affix a tax stamp was 18.6 months. Id. The average time served for possession of a firearm by a felon was only 16.2 months, not five years. Id. Thus, the average prospective parolee who committed the same crimes as Baldón would face more than eight additional years in prison if he or she did not sign the parole agreement containing a search provision. Under these circumstances, it is unreasonable to believe that the reality of consent normally derived from the benefits exchanged between the parties to a contract applies to parole agreements. The amount of freedom typically at stake points to the coercive nature of consent searches as a precondition to release.
Additionally, a prisoner essentially has nothing to bargain when it comes to parole because the parole system does not offer early parole to inmates who agree to be searched if paroled. Instead, inmates are entitled to parole under a different calculation, but the parolee must nevertheless agree to the terms of parole as a condition of release. Iowa Admin. Code r. 201-45.1(2) (“The parolee may not be released on parole prior to the execution of the parole agreement.”). Thus, the refusal to consent to a warrantless and suspicionless search simply means many, many more years in prison, while giving consent does not offer release to a parolee earlier than otherwise entitled. More fundamentally, parolee consent searches are conceptually detached from the concept of bargaining because the State would be able to impose any reasonable term of parole irrespective of the consent of the parolee.
From a practical standpoint, consent under these circumstances is not real. We are duty bound to give the liberty in article I, section 8 of our constitution the integrity it deserves and demands, and we must not allow the government to avoid an important constitutional check on its power by using an unfair play on human nature. To give article I, section 8 its integrity, we must hold Baldon’s acceptance of the parole agreement did not constitute consent under our precedent.
Moreover, there was no additional evidence in the record to reveal Baldón voluntarily consented to a search, even in the absence of bargaining power. The conclu-sory evidence in this case that Baldón read and understood the terms of the parole agreement does not establish his consent. Nevertheless, the State relied on the parole agreement alone to establish consent, which we conclude is inadequate.
Considering our obligation to ensure that consent remains a doctrine of volun-tariness that functions with integrity, we conclude a parole agreement containing a prospective search provision is insufficient evidence to establish consent. Such a contract reveals an absence of bargaining power on behalf of the parolee, rendering *803 contract principles inadequate to entitle the state to enforce compliance of a search provision. The purported consent extracted from a prisoner as a condition of release fails to constitute voluntary consent. As a mandatory term of parole, such consent would also have the effect of justifying the search on the basis of parole status. This is not permitted under Ochoa. More is needed, and a consent provision in a parole agreement does not supply this additional justification because it fails to pass the test of voluntariness required under article I, section 8 of the Iowa Constitution.
V. Conclusion.
For the reasons stated above, we hold that the search provision contained in Bal-don’s parole agreement does not represent a voluntary grant of consent within our constitutional meaning. As such, the sus-picionless search of Baldon’s car violated article I, section 8 of the Iowa Constitution. Accordingly, the district court’s denial of Baldon’s motion to suppress is reversed, and the case is remanded to the district court for further proceedings.
REVERSED AND REMANDED FOR NEW TRIAL.
WIGGINS, HECHT, APPEL, and ZAGER, JJ., join this opinion; APPEL, J., files a separate concurring opinion; and MANSFIELD, J., files a dissenting opinion in which WATERMAN, J., joins.

. In the past, we did not always employ the doctrine of independent state grounds to expand civil liberties. In Torn, for example, we said:
We are now squarely confronted with the proposition as to whether or not we will continue to follow the Supreme Court of the United States in the rule of [Boyd v. United States, 116 U.S. 616, 638, 6 S.Ct. 524, 536, 29 L.Ed. 746, 753-54 (1886), and Weeks v. United States, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652, 656 (1914)]. The consideration of such a proposition may well "give us pause.” The question is of great importance in the administration of the criminal laws of this state.
195 Iowa at 104-05, 191 N.W. at 535. We ended up rejecting the exclusionary rule. See id. at 107, 191 N.W. at 536. Of course, the United States subsequently incorporated the Fourth Amendment’s exclusionary rule against the states in Mapp v. Ohio, 367 U.S. 643, 655-57, 81 S.Ct. 1684, 1691-92, 6 L.Ed.2d 1081, 1090-91 (1961). The incorporation doctrine commands that we no longer use independent state grounds to sink below the federal floor.

. Without expressly saying so, we decided Cullison based on the Iowa Constitution. 173 N.W.2d at 537-38. The keystone of our reasoning there was article II, section 5 of the Iowa Constitution, which strips Iowa prisoners of a single right: the right to vote. Id. The Iowa Constitution does not strip prisoners or parolees of other rights. Thus, it is apparent that our holding in Cullison — that a parolee enjoys a comparable level of constitutional protection from unreasonable searches and seizures as nonparolees — was inextricably tied to the Iowa Constitution. Of course, our reliance on the Iowa Constitution would have been irrelevant if Cullison was a Federal Fourth Amendment case.

. The "act of grace” theory was built upon the argument that parole is a "privilege.” 5 LaFave § 10.10(b), at 525-26. The United States Supreme Court rejected this theory two years after the Iowa Supreme Court did. See Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484, 495 (1972). The Court stated:
It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a "right” or a "privilege.” By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment.

Id.

. Our ultimate resolution of this case does not render the conditions of a parole agreement unenforceable. The State may ordinarily impose any reasonable condition on the grant of parole. Cf. State v. Valin, 724 N.W.2d 440, 445-46, 448-49 (Iowa 2006) (recognizing the state may impose reasonable conditions of probation, but holding that a probation condition requiring a sex offender who was convicted of operating while intoxicated to be subjected to a penile plethysmograph exam for sexual arousal was unreasonable). A violation of that condition can result in a revocation of parole and a return to prison. Thus, our decision does not mean parolees are not required to follow reasonable conditions of parole, including a reasonable search provision, or that they could not have parole revoked for failing to comply with a term in the parole agreement. This case only deals with the narrow question whether the government may enforce compliance with a condition of probation through the contractual principle of consent. The reasonableness standard does not supersede the voluntariness standard for determining the validity of searches conducted to a purported consent. If it did, we think very little would remain of the voluntariness standard articulated in Schneckloth. This is precisely because the state imposes reasonable conditions; the prospective parolee does not agree to them. See Iowa Admin. Code r. 201-45.1(2)(n) ("The parolee may not be released on parole prior to the execution of the parole agreement. The parole agreement shall contain the conditions of parole pursuant to rule 45.2(906)....” (Emphasis added.)); id. r. 201-45.2 (listing ten standard conditions of parole with which the parolee "shall” comply).