ZAGER, Justice
(dissenting).
I respectfully dissent. I believe the search in this case was constitutional under both the State and Federal Constitutions. I disagree with the majority’s framing of the issue and the majority’s reliance on State v. Cullison, 173 N.W.2d 533 (Iowa 1970), as controlling precedent on this issue. Though Cullison has some minimal relevance to the issue presented, I would interpret our constitution according to developments in search and seizure jurisprudence since that time and according to the particular circumstances of this case. Under that analysis, I would hold the search in this case was constitutional.
The majority curiously sidesteps the true issue in this case, which was unanswered in Ochoa and Baldón. In doing so, the majority departs from the incrementalist approach we have recently taken in search and seizure cases under the Iowa *528 Constitution. See State v. Kern, 831 N.W.2d 149, 170 (Iowa 2018) (declining to consider whether the special-needs doctrine was viable under article I, section 8 in the absence of facts “to support an application of the doctrine in a way that reveals its purpose and rationale”); State v. Baldon, 829 N.W.2d 785, 800 (Iowa 2013) (“The narrow question before us is whether the government can conduct the search based solely on consent required to be given by parolees' as a condition of release from prison.”); State v. Ochoa, 792 N.W.2d 260, 291 (Iowa 2010) (emphasizing the broader questions being left unanswered). Under this approach, we have decided search and seizure cases according to the facts presented, not according to a selective reformulation of those facts. See Kern, 831 N.W.2d at 170; see also Baldon, 829 N.W.2d at 801 (“We have no occasion in this case to consider other grounds available to the State to justify such a search.”). The steps taken in these cases may have been small, but at least they have been based on the unique circumstances of the cases before the court.
When he was placed on probation, Short executed a probation agreement under which he consented to a search of his person, property, place of residence, vehicle, and personal effects at anytime, with or without a search warrant, “by any probation officer or law enforcement officer having reasonable grounds to believe contraband is present.” (Emphasis added.) The district court in its order referred to this language as a “waiver.” There is no dispute that the probation agreement contained consent-to-search language.
In addition, the district court found the search of Lorenzen’s apartment was based upon probable cause, even after acknowledging the search warrant itself was defective. Short never challenged this probable-cause finding for the search. Nevertheless, the majority characterizes the officers’ individualized suspicion as only “reasonable suspicion.” I believe, in light of the district court’s undisputed finding of probable cause, coupled with the consent language of the probation agreement and our caselaw, we should address whether under the Federal and Iowa Constitutions, general law enforcement authorities may constitutionally conduct a warrantless search of a probationer based on the individual’s waiver of his search and seizure rights and probable caus.[30] The majority elects to avoid the consent issue altogether, critically diminishing its persuasiveness and effect.
The flaws of the majority’s analysis do not end with the framing of the issue. In relying on Cullison, the majority asserts “[tjhere can be no question that Cullison involves a holding under the Iowa Constitution.” While this is true, Cullison does *529 not mention article I, section 8, and it clearly was not decided on this basis. A tradition carrying through this court’s history, and continuing down to the present, is for this court, when interpreting a provision of the Iowa Constitution, to quote the provision, see, e.g., Ochoa, 792 N.W.2d at 268 (quoting article I, section 8); State v. Cline, 617 N.W.2d 277, 281 n. 2 (Iowa 2000) (same), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (Iowa 2001); Lee Enters., Inc. v. Iowa State Tax Comm’n, 162 N.W.2d 730, 736 (Iowa 1968) (quoting article III, section 29); Sperry & Hutchinson Co. v. Hoegh, 246 Iowa 9, 18-19, 65 N.W.2d 410, 416 (1954) (quoting article I, section 6), or to state the rule of the provision, see, e.g., Cline, 617 N.W.2d at 281 (paraphrasing article I, section 8); State v. Carter, 161 N.W.2d 722, 724 (Iowa 1968) (paraphrasing article I, section 8); State v. Cameron, 254 Iowa 505, 511, 117 N.W.2d 816, 819 (1962) (paraphrasing article I, section 10), overruled on other grounds by State v. Bowers, 661 N.W.2d 536, 543 (Iowa 2003). If not directly quoting or paraphrasing the provision, at least it has been mentioned. See, e.g., State v. Tonn, 195 Iowa 94, 103, 191 N.W. 530, 534 (1923) (mentioning the identity between the wording of article I, section 8 and the wording of the Fourth Amendment), abrogated by Cline, 617 N.W.2d at 291.[31] If Cullison was interpreting article I, section 8, as the majority claims, then the case is a distinct and inexplicable oddity. For Cullison does not quote article I, section 8, and neither does it state the provision’s rule. Nowhere does Cullison even mention article I, section 8 in either the majority opinion or dissents.
Most conspicuous in Cullison is the analogous federal constitutional provision, the Fourth Amendment. That constitutional provision is quoted once in its entirety. See Cullison, 173 N.W.2d at 538 (quoting Camara v. Mun. Ct., 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967)). Additional references to the Fourth Amendment are also scattered throughout. See, e.g., id. (noting that, “in the field of administrative processes involving health and safety of the people, Fourth Amendment rights are now fully respected”). Indeed, the court mentioned the Fourth Amendment more than ten times in an analysis that spans fewer than seven pages in the North Western Reporter. See, e.g., id. at 536 (“The foregoing discloses some tribunals ..., Strip a parolee of all Fourth Amendment rights while others Dilute them.”). In addition to those references to the Fourth Amendment, the court referred to the Fourteenth Amendment. The court noted that “the Fourth Amendment is enforceable against the States through the Fourteenth Amendment.” Id. at 538. Were the court interpreting the Iowa Constitution, this statement would have been superfluous. Both the incorporation doctrine and the Fourteenth Amendment are irrelevant to the enforceability of the Iowa Constitution’s repository of protections.[32]
*530 Also, while the resolution of the issue in Cullison caused dissension among the court’s members, it seems they were able to agree on one important point: the constitutional provision the court was interpreting. Both dissents, like the majority opinion, mentioned the Fourth Amendment. See id. at 542 (Larson, J., dissenting) (“[T]he protection afforded by the Fourth Amendment to the United States Constitution is only against unreasonable searches.... ”); id. at 544 (Snell, J., dissenting) (discussing Fourth Amendment search and seizure protections). And, like the majority opinion, neither dissent mentioned article I, section 8. Thus, Cullison was a 5-4 decision that, in addition to a majority opinion, consisted of two dissenting opinions, and no justice even mentioned article I, section 8 of the Iowa Constitution.
Yet, in spite of the invisibility of article I, section 8 in Cullison, the majority in this case unequivocally asserts the case’s holding is under that provision. I would draw the opposite conclusion in the face of the unmistakable, explicit indications to the contrary. Cullison is without question not a holding under article I, section 8 of the Iowa Constitution. That being so, I would conclude Cullison is not substantive authority under article I, section 8, and we are not bound to follow Cullison in this case.
Even if one were to concede somehow that Cullison was interpreting article I, section 8 of the Iowa Constitution, there are numerous reasons not to apply Culli-son’s holding to this case. See State v. Bruce, 795 N.W.2d 1, 3 (Iowa 2011) (noting despite the principle of stare decisis we must reconsider unsound previous decisions). First, we have since Cullison held that when interpreting this state’s constitution we rely on federal cases interpreting the Federal Constitution only to the extent that the reasoning of those cases persuades us. See Ochoa, 792 N.W.2d at 267. Cullison not only relied almost completely on federal cases while doing little analysis to establish their persuasiveness, but also hinted that, if the United States Supreme Court had addressed the issue presented in the case, it would have deferred to that tribunal’s interpretation. See 173 N.W.2d at 535. Neither approach is a permissible method of resolving cases under our state’s organic document. See Ochoa, 792 N.W.2d at 267; Cline, 617 N.W.2d at 285. An earlier case’s inconsistency with our established current deci-sional methods almost compels us to reconsider the case’s continued viability.
There are also factual and legal distinctions in Cullison that compel us to reconsider its continued validity. Cullison’s conclusion was based in part on reasoning that is now questionable in light of subsequent developments. Cullison cited a bevy of federal cases and secondary authorities for the proposition a parolee’s right to equal protection might be violated by admitting evidence obtained in a war-rantless search. See 173 N.W.2d at 538. Afterward, Griffin v. Wisconsin, Samson v. California, and United States v. Knights upheld warrantless searches of probationers and parolees. See Samson, 547 U.S. 843, 857, 126 S.Ct. 2193, 2202, 165 L.Ed.2d 250, 262 (2006); Knights, 534 U.S. 112, 122, 122 S.Ct. 587, 593, 151 L.Ed.2d 497, 507 (2001); Griffin, 483 U.S. 868, 876, 107 S.Ct. 3164, 3169-70, 97 L.Ed.2d 709, 719 (1987). Clearly, the development of this area of the law shows this concern no longer serves as a basis for according of *531 fenders and law-abiding citizens equal search protections.
What makes Cullison most factually distinct is its lack of a consent-to-search provision in the parole agreement. This is a significant reason why Cullison is distinguishable from Baldón, in which such provisions became the focus of our analysis of consent and waiver. See Baldón, 829 N.W.2d at 800-01 (explaining the issue before the court). The majority chooses to ignore this important distinction without further analysis, which makes the opinion suspect. How can the majority decide this case without discussing the consent-to-search provision contained in Short’s probation agreement?
Also, a parole officer performed the search in Cullison. See 173 N.W.2d at 539-40. We have previously drawn a distinction between searches performed by general law enforcement officers and searches performed by corrections authorities; the justifications for the two searches are different. See Kern, 831 N.W.2d at 171 (explaining a search of a parolee could not fit “the special-needs rubric” because “the search was significantly entangled with a larger law enforcement operation”); Ochoa, 792 N.W.2d at 289 (distinguishing searches performed by parole officers and searches performed by general law enforcement). In this case, general law enforcement performed the search. Thus, the reasons used to reject the parole search in Cullison are not importable to this case. This further diminishes the precedential versatility of Cullison.
Finally, the search in Cullison, as in Ochoa, was not supported by any level of individualized suspicion. See Ochoa, 792 N.W.2d at 288 (noting police officer performed search without any cause); Culli-son, 173 N.W.2d at 540 (concluding the presearch reasonable or probable cause, essential to its validity, was not present there or established to support the search). Because there was not even an argument of reasonable suspicion or probable cause, the court did not have to consider whether some level of individualized suspicion might have constrained officer discretion to the point of making the warrantless search constitutionally permissible. Here, there.was undisputed probable cause to support the search of Short’s residence. Cullison thus presented a clearly distinguishable legal and factual scenario for the decision. For all these reasons, the broad principle espoused in Cullison is not appropriately applicable to the concrete facts presented by this case. Cf. Kern, 831 N.W.2d at 170 (“[T]he need for new legal doctrines is best considered when facts exist in a case to support an application of the doctrine in a way that reveals its purpose and rationale.”). Therefore, I would conclude the broad holding adopted by the majority, relying on Cullison, that a search warrant is required under all circumstances for the search of any person’s home, does not prevent us from treating probationers differently from law-abiding citizens for purposes of article I, section 8.
The determination that Cullison’s holding does not control the outcome of this case is just the starting point of the analysis. As the majority recognizes, we have repeatedly declined to dogmatically interpret article I, section 8 in the manner the United States Supreme Court interprets the Fourth Amendment, despite the obvious textual similarities between the two provisions. See, e.g., id. at 170 (explaining the Fourth Amendment special-needs doctrine and concluding the doctrine cannot be used “to make an end-run” around parolees’ rights under the Iowa Constitution); Ochoa, 792 N.W.2d at 267 (holding searches and seizures are to be analyzed independently under the Iowa Constitution); Cline, 617 N.W.2d at 283 (declining *532 “to adopt a good faith exception to Iowa’s exclusionary rule under the Iowa Constitution”). Indeed, were we “to blindly follow federal precedent,” we would be abdicating our “constitutional role in state government.” Cline, 617 N.W.2d at 285.
That said, we have not discarded federal precedents from the panoply of available persuasive sources. In Ochoa, we declined to follow the Supreme Court’s interpretation of the Fourth Amendment in Samson, taking instead a constitutional path under our own constitution that rejected war-rantless searches of parolees “without any particularized suspicion or limitations to the scope of the search.” Ochoa, 792 N.W.2d at 291; see also Samson, 547 U.S. at 857, 126 S.Ct. at 2202, 165 L.Ed.2d at 262 (holding “the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee”). In doing so, however, we emphasized the “respectful consideration” to which Supreme Court precedents are entitled. See Ochoa, 792 N.W.2d at 267; cf. Baldon, 829 N.W.2d at 790 (“In the final analysis, our right under principles of federalism to stand as the final word on the Iowa Constitution is settled, long-standing, and good law.”). Keeping that in mind, I turn now to those precedents.
The Supreme Court has twice upheld warrantless searches of probationers under the Fourth Amendment. In Griffin, probation officers conducted a warrantless search of a probationer’s home under a Wisconsin probation regulation that allowed warrantless searches based on “reasonable grounds.” 488 U.S. at 871, 107 S.Ct. at 3167, 97 L.Ed.2d at 715 (internal quotation marks omitted). The Supreme Court upheld the search, finding it justified by the special needs of Wisconsin’s probation system. See id. at 876,107 S.Ct. at 3169-70, 97 L.Ed.2d at 719. Though representative of the Supreme Court’s overall search and seizure jurisprudence, Griffin’s reasoning is distinguishable because police and sheriffs deputies, not probation officers, searched Short. See 5 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.10(c), at 542 (2012) [hereinafter La-Fave, Search and Seizure ] (observing a search performed by police officers could not pass muster under Griffin’s special-needs rationale).
Later, in Knights, the Supreme Court confronted an issue very similar to one before us in this case. 534 U.S. at 118,122 S.Ct. at 591, 151 L.Ed.2d at 504. There, a probationer, who was subject to a probation-search condition similar to that contained in Short’s probation agreement, was suspected of vandalizing a business dozens of times. See id. at 114-15, 122 S.Ct. at 589, 151 L.Ed.2d at 502-03. After a police detective observed suspicious activity outside the probationer’s apartment and viewed suspicious objects in the vehicle of the probationer’s accomplice, the detective, who knew of the probation-search condition, searched the probationer’s apartment. See id. at 115, 122 S.Ct. at 589, 151 L.Ed.2d at 503. The search uncovered evidence suggesting the probationer was the vandal, and he was arrested on federal criminal charges. See id. at 115-16, 122 S.Ct. at 589,151 L.Ed.2d at 503.
Knights moved to suppress the evidence obtained during the warrantless search of his apartment, arguing the search violated the Fourth Amendment. See id. at 116, 122 S.Ct. at 590, 151 L.Ed.2d at 503. The district court found law enforcement had “ ‘reasonable suspicion’ to believe that Knights was involved with incendiary materials,” but “nonetheless granted the motion to suppress on the ground that the search was for ‘investigatory’ rather than ‘probationary5 purposes.” See id. The Court of Appeals for the Ninth Circuit *533 affirmed, relying on its earlier decisions to hold the search condition in Knights’s probation order “ ‘must be seen as limited to probation searches, and must stop short of investigation searches.’” See id. (quoting United States v. Knights, 219 F.3d 1138, 1142-43 (9th Cir.2000)).
A unanimous Supreme Court reversed the ruling of the court of appeals. See id. at 122, 122 S.Ct. at 593, 151 L.Ed.2d at 507 (reversing and remanding for further proceedings). The Supreme Court first noted that the Supreme Court of California had already upheld searches pursuant to this California probation condition “ ‘whether the purpose of the search is to monitor the probationer or to serve some other law enforcement purpose.’ ” See id. at 116, 122 S.Ct. at 590, 151 L.Ed.2d at 503 (quoting People v. Woods, 21 Cal.4th 668, 88 Cal.Rptr.2d 88, 981 P.2d 1019, 1027 (1999), cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000)).
The Supreme Court declined to base its holding on the “consent” rationale argued by the Government in cases such as Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946), and Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). See Knights, 534 U.S. at 118, 122 S.Ct. at 591, 151 L.Ed.2d at 504-05. The Supreme Court found it did not need to decide whether acceptance of the search condition constituted consent in the Schneckloth sense of a complete waiver of Fourth Amendment rights. See id. at 118, 122 S.Ct. at 591, 151 L.Ed.2d at 505. Instead, it concluded that the search of Knights’s apartment was reasonable under its “general Fourth Amendment approach of ‘examining the totality of the circumstances,’ ” considering the probation search condition as being a salient circumstance. Id. (quoting Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347, 354 (1996)).
In rejecting Knights’s argument, the Supreme Court focused on the balance of the individual’s privacy interest and the government’s legitimate interests. See id. at 119, 122 S.Ct. at 591, 151 L.Ed.2d at 505. According to the Supreme Court, a probationer has a diminished expectation of privacy because probation is a criminal sanction that reasonably deprives an individual of freedoms ordinarily enjoyed by law-abiding citizens. See id. Further, the Court reasoned the government has a legitimate interest in supervising probationers, given their high probability of reof-fending. See id. at 120-21, 122 S.Ct. at 592, 151 L.Ed.2d at 506. After weighing the interests, the Supreme Court unanimously upheld the police detective’s war-rantless search of the probationer’s apartment “supported by reasonable suspicion and authorized by a condition of probation.” Id. at 122, 122 S.Ct. at 593, 151 L.Ed.2d at 507.
The balancing approach the Supreme Court employed in Knights evaluates a search’s reasonableness, “[t]he touchstone of the Fourth Amendment.” See id: at 118-19, 122 S.Ct. at 591, 151 L.Ed.2d at 505 (explaining how the Court tests for reasonableness); see also Samson, 547 U.S. at 848, 126 S.Ct. at 2197, 165 L.Ed.2d at 256 (explaining the balancing test). The Supreme Court thus held that in its balancing of these various considerations, no more than reasonable suspicion is necessary to conduct a search of a probationer’s house. See Knights, 534 U.S. at 121, 122 S.Ct. at 592, 151 L.Ed.2d at 506 (“We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer’s house.”). Expressed another way, the Supreme Court held that “law-enforcement searches of probationers who have been informed of a search condition are permissible upon individualized suspicion *534 of criminal behavior committed during the probationary period.” See id. at 122, 122 S.Ct. at 593, 151 L.Ed.2d at 507 (Souter, J., concurring).
There can be no reasonable dispute that Knights controls the determination whether the search of Short was constitutional under the Fourth Amendment to the Federal Constitution. Short was, like Knights, on probation, and he thus had a diminished expectation of privacy. See id. at 119, 122 S.Ct. at 591, 151 L.Ed.2d at 505. Like the government in Knights, law enforcement in this case had a legitimate interest in supervising Short, as it does all probationers. See id. at 120, 122 S.Ct. at 592, 151 L.Ed.2d at 506. Although the search in Knights was supported by reasonable suspicion, the search of Short was supported by probable cause, a higher level of suspicion. See id. at 122, 122 S.Ct. at 593, 151 L.Ed.2d at 507. Given the relevant factual similarities and the higher level of suspicion that supported the search in this case, this search was incontestably reasonable and therefore permissible under the Fourth Amendment.
Of course, the conclusion reached by the United States Supreme Court under the Fourth Amendment does not resolve the question of the constitutionality of the search under article I, section 8 of the Iowa Constitution. As the majority notes, this court has resisted reasonableness as the measure of the constitutionality of a search under the Iowa Constitution. This, even though article I, section 8 mirrors the Federal Constitution regarding unreasonable seizures and searches, and this court’s own statement that “[tjhere is of course little doubt that, in light of the nearly identical language in article I, section 8 and the Fourth Amendment, they were generally designed with the same scope, import, and purpose.” See Ochoa, 792 N.W.2d at 267. This is also in spite of this court in Cullison explicitly looking to the factual situation in that case to determine the reasonableness of the extended search. Cullison, 173 N.W.2d at 539 (“We must look now to the factual situation here involved to determine reasonableness of the extended search.... ” (Emphasis added.)). Completely diverging from this reasonableness approach we utilized in Cullison and emphasizing this court’s traditional “warrant preference rule,” we explained in Ochoa that the reasonableness clause of the Iowa Constitution “cannot be used to override the Warrant Clause” of the Iowa Constitution, lest the warrant clause be rendered surplusage. 792 N.W.2d at 269, 291; see also id. at 289 (criticizing the reasonableness test as “based not on the particular facts of a case but on larger policies bolstered by the purported needs of law enforcement”). The majority in this case wants to rely on Cullison and its analysis of the Fourth Amendment for determining the reasonableness of a search, but then disregards it in Ochoa and in this case. Instead, the majority utilizes Culli-son for a broad holding for the necessity of search warrants under all circumstances when this really had nothing to do with the holding of the case. While I acknowledge in deciding whether to follow the Supreme Court’s lead down any constitutional path this court is not bound to use the same analytic vehicle, there should at least be some analytical consistency.
Even our own authority leaves open the clear possibility of an exception to the warrant requirement under certain circumstances. See Ochoa, 792 N.W.2d at 287 (positing one way of resolving the issue in the case would be to accept a new exception to the warrant requirement). We have repeatedly counseled that a war-rantless search is unconstitutional unless it falls within an exception to the warrant requirement. See, e.g., State v. Lowe, 812 N.W.2d 554, 568 (Iowa 2012) (explaining a *535 warrantless search is unreasonable if it does not fall within a recognized exception); Cline, 617 N.W.2d at 282 (“A war-rantless search ... is per se unreasonable unless it falls within a recognized exception.”). Our recognized exceptions to the warrant requirement include: (1) searches founded on probable cause coupled with exigent circumstances; (2) consent searches; (3) searches incident to arrest; (4) plain view searches; and (5) community-caretaking searches. See Kern, 831 N.W.2d at 172-73 (explaining the community-caretaking exception); State v. Watts, 801 N.W.2d 845, 850 (Iowa 2011) (mentioning four exceptions to the warrant requirement); State v. Naujoks, 637 N.W.2d 101, 107 (Iowa 2001) (listing four “well-recognized exceptions to the warrant requirement”). The majority has expressed the opinion that the United States Supreme Court has “reconstructed,” “reengineered,” and “reconfigured” our search and seizure law resulting in the erosion of the protections afforded to individuals under the Fourth Amendment, and expressed an unwillingness to consider expanding any such exceptions under our Iowa Constitution. I think the failure to even consider well-recognized jurisprudence providing exceptions to the warrant requirement is wrong, and fails to uphold our duty to the citizens of Iowa.
As previously noted, one recognized exception to the warrant requirement under our constitution is consent. State v. Reinier, 628 N.W.2d 460, 464-65 (Iowa 2001). “Under this exception, the reasonableness requirement of the Search and Seizure Clause is satisfied when an individual consents to a search.” Baldón, 829 N.W.2d at 791. The consent waives an individual’s rights under the Search and Seizure Clause.[33] Id.
In Baldón, we held a search provision contained in a parole agreement did not constitute consent to search under the Iowa Constitution. See id. at 803. But, it is important to understand the reasoning we relied on in reaching this conclusion. First, we set aside from consideration the cases dealing with probation agreements like those we are dealing with here. See id. at 795. We said probation agreements were of limited value in analyzing the consent issue because probationers “maintain a vastly superior bargaining power than parolees.” See id. We noted with approval that many courts find that this vastly superior bargaining power of probationers “renders probation agreements consensual.” See id.
Second, we noted that courts in other states had rejected consent derived from parole agreements as a theory for upholding searches of parolees because such a condition of parole was coercive and therefore involuntary. See id. at 796. It was this lack of free will or “no ‘choice’ ” if a person wanted to be released from prison, which determined our decision on consent. See id. (quoting Samson, 547 U.S. at 863 n. 4, 126 S.Ct. at 2206 n. 4, 165 L.Ed.2d at 267 n. 4 (Stevens, J., dissenting)).
Finally, in Baldón, we surveyed the academic community and noted it had also recognized weaknesses in treating consent searches as voluntary searches in the context of a parole agreement. See id. at 797-800. We, therefore, decided Baldón based on the vastly unequal bargaining power of the parolee, the coercive atmosphere of parole, and “no choice” concerning the search condition. We concluded *536 “consent under these circumstances [was] not real,” and we held Baldon’s acceptance of the parole agreement did not constitute voluntary consent. Id. at 802-03.
Of course, there is no similarity between the search of Baldón and the search of Short. Here, we are dealing with a probation agreement. A majority of the courts across the nation that have considered the issue have concluded that “consent-search provisions in probation agreements constitute a waiver of search-and-seizure rights.” Id. at 792-93 (citing cases); see also, e.g., United States v. Barnett, 415 F.3d 690, 691 (7th Cir.2005) (“Constitutional rights like other rights can be waived, provided that the waiver is knowing and intelligent, as it was here.”); State v. Gauron, 112 Idaho 841, 736 P.2d 1295, 1297 (1987) (upholding warrantless search of probationer based on consent contained in probation agreement); People v. Absher, 242 I11.2d 77, 351 IlLDec. 163, 950 N.E.2d 659, 668 (2011) (upholding suspicionless search based on consent to a warrantless search). In contrast, only a few jurisdictions that have considered the issue have concluded probationers do not voluntarily consent to these search provisions. See Baldón, 829 N.W.2d at 793-94 (citing cases); see also, e.g., Grubbs v. State, 373 So.2d 905, 910 (Fla.1979) (holding a provision in probation agreement did not establish consent, but stating that “probationary status may be used as a factor to establish probable cause”). Clearly, as these cases show, consent or waiver provisions in probation agreements do not suffer from the same constitutional infirmities as found in Bal-dón in the parole context. Again, the majority avoids analyzing the consent issue, despite it being raised and argued by the parties.
While a majority of courts have upheld the waiver provisions against constitutional attack in the probation context, the analysis does not end on consent alone. The surrounding circumstances of the search itself must also be considered. In our leading parole search case of Ochoa, a police officer searched a parolee’s motel room without any particularized suspicion and without a warrant. 792 N.W.2d at 262. Though we explicitly considered its possibility, we declined to create a new exception to the warrant requirement in the parole context. See id. at 287 (“We would, in essence, find that the facts of this case do not establish one of the ... exceptions to the warrant requirement.”). Instead, we held warrantless, suspicionless searches of parolees invalid “even under a reasonableness analysis.” Id. In doing so, we noted our holding did not reach a few questions, including “whether individualized suspicion amounting to less than probable cause may be sufficient in some contexts to support a focused search” by general law enforcement. Id. at 291. We also did not reach the question whether a warrant would even be necessary to limit law enforcement’s authority to search offenders. See id. In other words, Ochoa left open the question whether a warrant-less search of a parolee, supported by individualized suspicion, may be constitutionally valid, even when no other recognized warrant exception applied.
We set forth in Ochoa the primary considerations we used to resolve the issue in that case, intending that those considerations guide future cases. We traced events back to the English Crown’s use of “general warrants,” which were “open-ended as to time, place, and duration,” but warrants nonetheless. See id. at 269. In one Eighteenth Century English case challenging a general warrant, an esteemed jurist “rejected arguments that general warrants were necessary to advance the ends of government.” Id. at 270. The judge quipped, “[I]f suspicion at large should be a ground of search, ... whose *537 home would be safe?” Id. (internal quotation marks omitted). This resistance to unrestrained, suspicionless warrants, expressed in English caselaw, was “well-known in the American colonies.” Id.
The experience in the American colonies was similar, but the warrants issued under a different moniker. See id. at 271 (explaining writs of assistance “allowed general searches for customs violations”). “[W]rits of assistance” were broader than general warrants issued in England. Id. The writs “were not returnable after execution,” continuing instead “to authorize general searches during the life of the sovereign.” Id. Officials to whom the writs were issued possessed unlimited discretion. See id. Like their counterparts across the Atlantic, the colonists strongly opposed the open-ended authority conferred by the writs. See id.
We reasoned this historical background of the Fourth Amendment, and “by implication” article I, section 8 of the Iowa Constitution, indicated an intent to limit arbitrary searches and seizures. See id. at 272. In addition, a review of the circumstances surrounding the adoption of the Federal and Iowa Constitutions confirmed the framers sought to protect against the government abusing its power. See id. at 274. Despite ongoing current debate over whether the framers accepted warrantless searches, the historical review suggested the framers did not intend to allow law enforcement to perform “broad, unlimited” warrantless searches. Id. at 273.
We also traced the development of the United States Supreme Court’s Fourth Amendment jurisprudence. See id. at 275-83 (discussing relevant precedents). After noting that exceptions for automobile searches, searches incident to arrest, and exigent circumstances still required a showing of probable cause, we described the Supreme Court’s relaxation in other contexts of the probable-cause requirement. See id. at 279. For instance, the Supreme Court has carved out an exception for “special needs” not related to law enforcement when a warrant and individualized suspicion are unnecessary. See id. (explaining the development of the special-needs exception); see also, e.g., Nat’l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 666, 109 S.Ct. 1384, 1391, 103 L.Ed.2d 685, 702 (1989) (holding the U.S. Customs Service’s drug-testing program presented a special need justifying a departure from the warrant and probable-cause requirements); Delaware v. Prouse, 440 U.S. 648, 654-55, 99 S.Ct. 1391, 1396-97, 59 L.Ed.2d 660, 668 (1979) (“In those situations in which the balance of interests precludes insistence upon ‘some quantum of individualized suspicion,’ other safeguards are generally relied upon to assure that the individual’s reasonable expectation of privacy is not ‘subject to the discretion of the official in the field....’” (Footnotes omitted.)) (quoting Camara, 387 U.S. at 532, 87 S.Ct. at 1733, 18 L.Ed.2d at 937). In cases with criminal implications, however, a view remained that some restraint on law enforcement’s discretion was necessary. See Ochoa, 792 N.W.2d at 280 (describing application of special-needs exception in cases with criminal implications); see also, e.g., City of Indianapolis v. Edmond, 531 U.S. 32, 44, 121 S.Ct. 447, 455, 148 L.Ed.2d 333, 345 (2000) (holding individualized suspicion necessary at narcotics checkpoints when general interest was crime control). Whatever the implications of the search, we reasoned protection against unrestrained government intrusion depended on some form of individualized suspicion, particularity, or “preestablished neutral criteria,” not on a warrant. See Ochoa, 792 N.W.2d at 280; cf. Von Raab, 489 U.S. at 667, 109 S.Ct. at 1391, 103 L.Ed.2d at 703 (explaining one primary purpose a warrant serves is merely to advise a citi *538 zen that a search is legally authorized). None of those limits on law enforcement was present in Ochoa.
Turning to the closely related United States Supreme Court cases, we reviewed Griffin, Knights, and Samson. See Ochoa, 792 N.W.2d at 280-83 (describing the Supreme Court’s application of Fourth Amendment principles to probationers and parolees). In discussing Samson, in which the Supreme Court upheld a warrantless, suspicionless search of a parolee, we focused primarily on the dissent authored by Justice Stevens and joined by Justices Souter and Breyer. See Ochoa, 792 N.W.2d at 282-83 (noting the “vigorous dissent”). Some discussion of the dissent is therefore necessary.
In the Samson dissent, Justice Stevens inveighed against the majority for upholding “an entirely suspicionless search unsupported by any special need.” 547 U.S. at 860, 126 S.Ct. at 2204, 165 L.Ed.2d at 264 (Stevens, J., dissenting). According to the three Justices, the majority “jettisoned” individualized suspicion without substituting any standards by which to “rein in officers and furnish a bulwark against the arbitrary exercise of discretion.” Id. at 860-61,126 S.Ct. at 2204,165 L.Ed.2d at 265. The dissent never hinted or suggested, however, that the bulwark against arbitrary government action was under all circumstances a search warrant. On the contrary, in all the dissenters’ indignation for the majority’s approach, even they would have dispensed with a search warrant under the circumstances. See id. at 857, 126 S.Ct. at 2202, 165 L.Ed.2d at 263 (arguing Knights and Griffin do not support “suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards”). And the framers of the Federal Constitution would have done so as well, according to the three dissenters. See id. at 858, 126 S.Ct. at 2203, 165 L.Ed.2d at 263 (“The suspieionless search is the very evil the Fourth Amendment was intended to stamp out.”). The dissenters declared, “The requirement of individualized suspicion, in all its iterations, is the shield the Framers selected to guard against the evils of arbitrary action, caprice, and harassment.” Id. at 866, 126 S.Ct. at 2207, 165 L.Ed.2d at 268. Law enforcement here had this individualized suspicion; in fact, probable cause existed to support the search of Short’s residence. Even the Samson dissenters, in all likelihood, would have upheld the search under these circumstances. The majority chooses to ignore this analysis.
Ochoa’s survey did not end at the Samson dissent; however, our rejection of war-rantless, suspicionless searches of parolees flowed largely from it and the historical narrative. We reasoned that law enforcement having the power to search “a parolee at any time, for anything, anywhere, including the home, without any suspicion of any kind” resembled too closely the general warrant “despised” by our forebears. See Ochoa, 792 N.W.2d at 287. Further, without some level of suspicion, even if only reasonable suspicion, there was no limit on whether a search could be conducted or on the search’s scope. See id. at 288. Our constitution, we inferred from the federal experience, aimed to prohibit “[sjuch unbridled discretion.” See id. After flaying the Samson majority’s dubious reasoning, we concluded “a parolee may not be subjected to broad, warrant-less searches by a general law enforcement officer without any particularized suspicion or limitations to the scope of the search.” See id. at 291.
The takeaway from Ochoa was that the search of the parolee was unconstitutional because there was no limitation whatsoever on the police officer’s discretion. See *539 id. (taking no position regarding whether some “means other than a warrant” that limited law enforcement’s power might pass constitutional muster). In Ochoa, the police officer lacked even a hunch on which to base the search. See id. at 288. This sought-after search power was “stunningly broad,” enabling law enforcement to search any parolee’s “books, records, diaries, invoices, and intimate surroundings” without limitation. See id. at 287-88. A power so broad could not be reconciled with a constitutional limitation on governmental search authority.
The search conducted in this case, in comparison to the searches conducted in Ochoa and Baldón, is clearly distinguishable. The search in this case “met the most stringent” Fourth Amendment search standard, “probable cause.” See United States v. Flynn, 664 F.2d 1296, 1300 n. 8 (5th Cir.1982) (declining to consider whether airplanes should be given the same constitutional treatment as cars because probable cause existed). Moreover, the scope was narrow, enabling officers to search only for evidence of the crime that Short was suspected of committing. Had these circumstances been present in Ochoa, this court might have joined with the nine Justices of the United States Supreme Court willing to discard the search-warrant requirement in Samson. Our search of cases involving parolees following Ochoa has indicated nothing to the contrary. See Kern, 881 N.W.2d at 176 (concluding officers lacked probable cause to perform exigent-circumstances search of parolee’s home); Baldón, 829 N.W.2d at 789 (noting the state never argued that it had even reasonable suspicion to search parolee).
As noted above, our constitutional independence frees this court from applying the reasoning the United States Supreme Court used to uphold the warrantless search of the probationer in Knights. That reasoning, which rests on judgments about a probationer’s privacy expectations and which was similarly applied to parolees in Samson, has been criticized as “totally circular.” See 5 LaFave, Search and Seizure § 10.10(c), at 544 (explaining the circularity of the Court’s logic in Knights ); Samson, 547 U.S. at 857-58, 126 S.Ct. at 2202-03, 165 L.Ed.2d at 263 (Stevens, J., dissenting) (chastising the majority’s combination of “faulty syllogism” and “circular reasoning”). Even so, it is undeniable that “by virtue of their status alone, probationers ‘ “do not enjoy the absolute liberty to which every citizen is entitled.” ’ ” Samson, 547 U.S. at 848-49, 126 S.Ct. at 2197, 165 L.Ed.2d at 257 (quoting Knights, 534 U.S. at 119, 122 S.Ct. at 587, 151 L.Ed.2d at 505). This commonsense observation provides initial support for differential treatment of probationers and law-abiding citizens under article I, section 8 of the Iowa Constitution.
In Iowa, the lowest level probationers do not enjoy the liberty to which law-abiding citizens are entitled. Iowa Code chapter 901B sets forth a “corrections continuum.” See Iowa Code § 901B.1(1) (2013). Probation, like parole, falls on “Level Two” of the corrections continuum, see id. § 901B.1(1)(6), sandwiched between “Level One,” “[njoncommunity based corrections sanctions,” see id. § 901B.l(l)(a), and “Level Three,” “[qjuasi-incarceration sanctions,” see id. § 901B.l(l)(c). Level two is further divided into three levels of sanctions, all of which contemplate at least supervision by corrections authorities. See id. § 901B.1(1)(6 )(l)-(3). Probationers subject to monitored sanctions “are monitored for compliance” with “administrative supervision sanctions” by corrections authorities. -See id. § 901B.1(1)(6 )(1). Supervised sanctions, the middle level, are regular probation supervision and any conditions in the proba *540 tion agreement or court order. See id. § 901B.1(1)(5 )(2). Finally, intensive supervision sanctions, in addition to subjecting a probationer to intense monitoring, provide for “electronic monitoring, day reporting, day programming, live-out programs for persons on work release or who have violated chapter 321J, and institutional work release under section 904.910.” Id. § 901B.1(1)(6 )(3). As may readily be seen, this legislative scheme envisions subjecting all probationers to governmental scrutiny to which no ordinary citizen is subject, thus depriving even the lowest level probationers of some degree of liberty-
Probation conditions may further abridge a probationer’s liberty. Iowa Code section 907.6 grants broad authority for doing so:
Probationers are subject to the conditions established by the judicial district department of correctional services subject to the approval of the court, and any additional reasonable conditions which the court or district department may impose to promote rehabilitation of the defendant or protection of the community. Conditions may include but are not limited to adherence to regulations generally applicable to persons released on parole and including requiring unpaid community service as allowed pursuant to section 907.13.
Among the parole regulations to which a probationer may be subject is the requirement that the probationer “secure and maintain employment.” Iowa Admin. Code r. 201 — 45.2(l)(c) (2013). Another regulation prohibits a probationer from travelling outside his or her county of residence without permission. See id. r. 201— 45.2(l)(d). Before leaving the state, a probationer must “secure advance written permission.” Id. A probationer may not change residences without permission. Id. r. 201 — 45.2(l)(e). A probationer may also be compelled to “cooperate in any treatmenVrehabilitation/monitoring program” specified by corrections authorities. Id. r. 201 — 45.2(l)(i). These restrictions are strong and significantly limit a probationer’s freedom, but as the statute makes plain, these are additional conditions to which a probationer might be subjected.
Iowa Code section 907.6 also authorizes courts to impose probation conditions. Courts may not impose unreasonable or arbitrary conditions. State v. Rogers, 251 N.W.2d 239, 243 (Iowa 1977). Otherwise, courts’ authority under this provision is broad. State v. Valin, 724 N.W.2d 440, 445 (Iowa 2006). We have approved a court’s order that a probationer spend six months in a residential treatment facility, even when it meant displacing the probationer’s child. See State v. Ogle, 430 N.W.2d 382, 383 (Iowa 1988) (finding district court did not abuse its discretion when imposing the probation condition). For its holding that a court is within its discretion even to tell a probationer where and with whom to live, Ogle exemplifies the impressive loss of freedom to which probationers are subject. See id. Such deprivation is necessary to promote the probationer’s rehabilitation and to protect the community. See id. at 384 (upholding probation condition); see also Iowa Code § 907.6 (providing conditions may be imposed “to promote rehabilitation of the defendant or protection of the community”).
Our caselaw, our statutes, and our regulations are evidence of a fundamental notion in our law. They show that deeply embedded in our system of law is the notion individuals sentenced for crimes, including those who remain outside a prison’s walls, do not enjoy the same complement of liberties as those of law-abiding citizens. Probationers, unlike ordinary citizens, must comply with stringent condi *541 tions under the watchful supervision of courts and corrections authorities. That our law permits this treatment differential is undeniable. It follows from this fundamental notion that probationers may be accorded different treatment under some constitutional provisions, provided governmental authority is adequately constrained.
Besides our jurisprudence on consent, one additional constraint on governmental authority is individualized suspicion. As we said in Cullison, “the basic purpose of [the search and seizure protection], as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.” See 173 N.W.2d at 538 (emphasis added). As all of the cases that have addressed searches of this nature confirm, it is this arbitrary and suspicionless search that is the crucial distinction between this case and the similar cases that have come before this court. See Kern, 831 N.W.2d at 176 (concluding officers lacked probable cause); Baldón, 829 N.W.2d at 789 (noting the State never argued that it had individualized suspicion to search parolee); Ochoa, 792 N.W.2d at 288 (noting police officer performed search without any individualized suspicion); Cullison, 173 N.W.2d at 540 (finding there was no “reasonable or probable cause” to support search). That the officers here had probable cause to search Lorenzen’s apartment negates a comparison between the search performed in this case and “the despised general warrant.” See Ochoa, 792 N.W.2d at 287. It was the general warrant’s conferral of unrestrained discretion upon law enforcement that was an impetus for the Fourth Amendment. See id.
The officers who searched Short operated under no such unrestrained or arbitrary discretion. Rather, having established through diligent investigation probable cause to believe Short committed a burglary, law enforcement applied for a search warrant. While the search warrant issued was ultimately determined to be invalid, the probable-cause finding by the independent judicial officer was never challenged. Not surprisingly, the stolen property was found at the apartment.
The probable-cause requirement significantly restrains law enforcement discretion. This standard is considerably more protective of probationers’ rights than the reasonable-suspicion standard upon which the search in Knights was upheld. See 534 U.S. at 122, 122 S.Ct. at 593, 151 L.Ed.2d at 507 (upholding warrantless search of a probationer supported by reasonable suspicion); see also Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990) (explaining that “[Reasonable suspicion is a less demanding standard than probable cause”); State v. Lewis, 675 N.W.2d 516, 525 (Iowa 2004) (“The reasonable and articulable suspicion standard ... is less than probable cause.”). To satisfy the reasonable-suspicion requirement, an officer need only have specific, articulable facts. See Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968). In Griffin, for instance, the United States Supreme Court found an unauthenticated tip that a probationer “ ‘had or might have’ ” guns adequate to supply reasonable suspicion. 483 U.S. at 878, 107 S.Ct. at 3171, 97 L.Ed.2d at 720. The Supreme Court determined, however, the same tip would not supply probable cause. See id.
In Iowa, “[t]he standard for probable cause is whether a person of reasonable prudence would believe a crime has been committed or that evidence of a crime might be located in the particular area to be searched.” Naujoks, 637 N.W.2d at 108. Probable cause demands from law *542 enforcement facts suggesting that the items sought in the search are linked to criminal activity and that those items will be found in the place to be searched. See State v. Gogg, 561 N.W.2d 360, 363 (Iowa 1997); see also State v. Thomas, 540 N.W.2d 658, 662-63 (Iowa 1995) (“The facts and information presented to establish this finding need not rise to the level of absolute certainty, rather, it must supply sufficient facts to constitute a fair probability that contraband or evidence will be found on the person or in the place to be searched.”). Applying the probable cause standard, we have invalidated searches on numerous occasions. See, e.g., Kern, 831 N.W.2d at 176 (holding officers lacked probable cause to search parolee’s home); Lewis, 675 N.W.2d at 525 (concluding officers lacked probable cause to make a warrantless entry into a backyard); State v. Myers, 570 N.W.2d 70, 75 (Iowa 1997) (concluding that “there was not probable cause for issuance of the search warrant”); Thomas, 540 N.W.2d at 666 (holding no probable cause existed to search all persons in a bar). The probable cause requirement’s insistence on sufficient facts provides a strong protection against arbitrary searches by law enforcement officers.
In addition, the concept of probable cause encompasses a number of legal rules designed to limit officers’ discretion and therefore to protect individuals’ rights. In Kern, for example, we rejected the argument an individual’s invocation of constitutional rights could be used by officers to establish probable cause. See 831 N.W.2d at 176. We also held a “defensive posture by an occupant of a home in response to an intrusion by police is not indicative of probable cause of a crime.” Id. These legal rules further restrain officers’ discretion to perform searches.
A strict requirement that officers have individualized suspicion before searching a probationer therefore alleviates our predominant concern in Ochoa — that unrestrained general law enforcement could intrude on a probationer’s privacy and rifle through the probationer’s possessions anytime, anywhere, without a warrant, to find evidence of a crime. See 732 N.W.2d at 287-88. Consistent with current Fourth Amendment jurisprudence and our own precedents, I would require that law enforcement must have at least individualized suspicion before law enforcement officers can search a probationer or the residence.
Here, deputies established probable cause for the search by applying for a search warrant. To do so, Deputy Barto-lozzi carefully set forth “facts, information, and circumstances,” including a police report and officer statements describing the burglary. See Iowa Code § 808.3 (describing the necessary contents of an application for a search warrant). The exhibits attached to the application described in detail the items taken in the burglary that deputies expected to find in the residence. Deputy Bartolozzi also described in detail the place to be searched, going so far as to include a picture and description of the residence, which was only later determined to be incorrect. An independent review by a judicial officer determined there was probable cause for the search and granted the search warrant based on Deputy Bar-tolozzi’s scrupulous and earnest efforts. Though the search warrant was later invalidated due to an incorrect address, probable cause was undisputedly established, and the correct address was subject to the search.
In addition to the finding of probable cause by an independent judicial officer, there were other forms of restraint on law enforcement’s discretion in this case. The *543 greatest concern with granting officers the authority to perform suspicionless searches of parolees in Ochoa was that the authority was neither “minimal and highly-defined,” nor “closely linked to an identified special need.” See 792 N.W.2d at 288. The search executed by the deputies in this case, however, was narrow and defined. Consistent with the warrant application, deputies searched for, and found, televisions, jewelry, shoes, and other items they believed would be found in the apartment based on their investigation. Unlike the search in Ochoa, the search here was not “contrary to the common-sense notion that ‘the scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.’ ” See 792 N.W.2d at 288 (quoting Terry, 392 U.S. at 19, 88 S.Ct. at 1878, 20 L.Ed.2d at 904). Rather, the search of Short was consistent with that notion. The limited scope of the search further controlled officer discretion.
The officers’ knowledge Short was on probation also restrained law enforcement discretion. This is not a situation like that of In re Tyrell J., in which the California Supreme Court upheld a police officer’s warrantless search of a juvenile probationer, even though the officer was unaware the juvenile was on probation. See 8 Cal.4th 68, 32 Cal.Rptr.2d 33, 876 P.2d 519, 530 (1994), overruled by In re Jaime P., 40 Cal.4th 128, 51 Cal.Rptr.3d 430, 146 P.3d 965, 972 (2006). In requiring law enforcement to first ascertain whether an individual is on probation, we avoid the possibility officers will search an individual “in the bare hope” the individual is on probation. See Jaime P., 51 Cal.Rptr.3d 430,146 P.3d at 969. To adequately restrain law enforcement discretion, officers must not only establish individualized suspicion, but also ascertain whether the individual to be searched is on probation. See Ochoa, 792 N.W.2d at 291 (explaining one reason for rejecting the warrantless, suspicionless search was that there was no available means of controlling arbitrary searches). Both requirements are integral to the prevention of arbitrary searches, and both requirements are present and have been met in this case.
Finally, in his probation agreement, Short consented to the warrantless search. At the time of the search, Short was on probation for third-degree theft, an aggravated misdemeanor. See Iowa Code § 714.2(3) (“Theft in the third degree is an aggravated misdemeanor.”). Short could have been sentenced to prison for up to two years. See id. § 903.1(2) (“When a person is convicted of an aggravated misdemeanor ... the maximum penalty shall be imprisonment not to exceed two years.”). Rather than being sentenced to serve a prison sentence, Short requested a suspended sentence and received a suspended sentence and probation. As part of that bargain, Short voluntarily agreed to subject himself to warrantless searches by law enforcement and corrections authorities alike. The consent provision is not alone a basis to uphold the search, but Short’s consent in the probation agreement should be a critical factor in upholding the search in this case. The lack-of-bargaining rationale we utilized in Baldón to conclude there was no voluntary consent to the search, is not applicable in the present case.
We would not be alone in holding law enforcement may search probationers without a warrant. Numerous state courts have upheld warrantless searches of probationers and parolees, some supported by individualized suspicion and some requiring probable cause. See State v. Montgomery, 115 Ariz. 583, 566 P.2d 1329, 1331 (1977) (upholding constitutionality of a probation condition that permitted warrant-less searches by law enforcement); State *544 v. Fields, 67 Haw. 268, 686 P.2d 1379, 1390 (1984) (holding a warrantless search of a probationer must be supported by reasonable suspicion); Gawron, 736 P.2d at 1297 (upholding a warrantless search of a probationer); State v. Schlechty, 926 N.E.2d 1, 8 (Ind.2010) (upholding warrantless search of a probationer supported by reasonable suspicion); State v. Bennett, 288 Kan. 86, 200 P.3d 455, 463 (2009) (rejecting a suspicionless search of a probationer on grounds that the search must “be based on a reasonable suspicion”); Parks v. Commonwealth, 192 S.W.3d 318, 330 (Ky.2006) (upholding a probation condition allowing law enforcement, on reasonable suspicion, to search a probationer without a warrant); State v. Malone, 403 So.2d 1234, 1239 (La.1981) (holding a warrantless probation search need only be supported by reasonable suspicion); State v. Burke, 235 Mont. 165, 766 P.2d 254, 257 (1988) (holding permissible a warrantless search of a probationer supported by reasonable cause); People v. Hale, 93 N.Y.2d 454, 692 N.Y.S.2d 649, 714 N.E.2d 861, 862, 865 (1999) (upholding search of a probationer’s home under a court-ordered probation condition); State v. Schlosser, 202 N.W.2d 136, 139 (N.D.1972) (upholding a warrant-less search of a probationer); State v. Turner, 297 S.W.3d 155, 169 (Tenn.2009) (upholding under the Tennessee Constitution a warrantless, suspicionless search of a parolee); State v. Winterstein, 167 Wash.2d 620, 220 P.3d 1226, 1230 (2009) (holding probation officers must have probable cause before performing a war-rantless search). Though of diverse reasoning, these cases set forth the principle that probationers and parolees may be searched upon a different set of circumstances than law-abiding citizens. I would decide this case according to those well-established principles.
Consent-to-search provisions in probation agreements advance the interests of both offender rehabilitation and societal protection. Probationers who have agreed to warrantless searches are more likely to abide by the law:
The condition of probation that defendant consent to a search of his person by a law enforcement officer without a search warrant is a supervisorial procedure related to his reformation and rehabilitation in light of the offense of which he was convicted. With knowledge he may be subject to a search by law enforcement officers at any time, he will be less inclined to [violate the law].
People v. Kern, 264 Cal.App.2d 962, 965, 71 Cal.Rptr. 105 (Ct.App.1968); accord People v. Bravo, 43 Cal.3d 600, 238 Cal.Rptr. 282, 738 P.2d 336, 342 (1987); Himmage v. State, 88 Nev. 296, 496 P.2d 763, 765 (1972); State v. Benton, 82 Ohio St.3d 316, 695 N.E.2d 757, 761-62 (1998); see also Hale, 692 N.Y.S.2d 649, 714 N.E.2d at 865 (“[0]ne way to encourage [the probationer to comply with the law] was to hold out the possibility that he would be checked up on, and stood to be incarcerated if he betrayed the terms of his negotiated probationary status.”). Of course, a probationer who is more likely to abide by the law is also less likely to harm others. See Owens v. Kelley, 681 F.2d 1362, 1367 (11th Cir.1982) (recognizing that probationary searches protect society “by the deterrent effect of the condition”). Consent-to-search agreements also “enhanc[e] the ability of law enforcement officers to detect any unlawful ... activities.” Id. “[I]f a defendant considers the conditions of probation too harsh, he has the right to refuse probation and undergo the sentence.” Gawron, 736 P.2d at 1297. Despite these obvious benefits, the majority fails even to discuss these widely used consent-to-search agreements as part of its analysis of this case and blindly follows the Fourth Amendment precedent found in Cullison.
*545 Based on all of the above considerations, I would hold the search of Short and his residence was permissible under not only the Fourth Amendment, but also under article I, section 8 of the Iowa Constitution. Such a conclusion is consistent with our precedents and the national consensus. After a diligent investigation, deputies established probable cause to believe evidence of the burglary was in Leya Lorenzen’s apartment, where Short was residing. Even knowing Short was on probation and subject to the consent-to-search provision of his probation agreement, law enforcement officers still established probable cause for the search and executed the narrow search for evidence. Upon doing so, they discovered the evidence they sought. Even without a warrant, the consent provided by the probation agreement, combined with the existence of probable cause and the narrow scope of the search, adequately restrained officer discretion.
The majority blindly elects to adhere to an absolute search warrant requirement as set forth in Cullison without considering the changing analysis of Fourth Amendment jurisprudence, and the jurisprudence found in other nationwide authority. Such adherence to the past, based on an underlying belief that the United States Supreme Court has eroded and diluted the rights of ordinary citizens to the protections under the Fourth Amendment, and that only a warrant will suffice, is unsound and illogical. The search in this case was constitutionally permissible under article I, section 8 of our Iowa Constitution and our precedents.
I would affirm.
WATERMAN, J., joins this dissent in part, and MANSFIELD, J., joins this dissent.

. The majority is correct that the State did not use the word “consent” in its brief. The State did, however, devote significant discussion to Short’s "waiver” of his search and seizure rights executed as part of his probation agreement. The district court did the same, as did the county attorney and Short's trial attorney. As the Seventh Circuit Court of Appeals has noted in a similar case, "Constitutional rights like other rights can be waived, provided that the waiver is knowing and intelligent, as it was here.” United States v. Barnett, 415 F.3d 690, 691 (7th Cir.2005). Thus, despite the absence of the word "consent,” the issue of Short's waiver of his search and seizure rights is highly relevant and properly considered as part of the issue before this court. It is clearly erroneous not to discuss consent and waiver in deciding this case.
Also, as is discussed later in this opinion, almost the entirety of the majority opinion in Baldón analyzes the parole agreement from the viewpoint of consent and the voluntariness of the consent-to-search agreement. The State also argued at oral argument that it was relying on the consent provision of the probation agreement itself in support of the search.

. In keeping with this tradition, the majority today quotes article I, section 8 in full. In addition, the majority also mentions article I, section 8 more than thirty times. There can be no doubt the court in this case is interpreting article I, section 8.

. As the majority notes, the Iowa Constitution does not go unmentioned in Cullison. See 173 N.W.2d at 537 (setting forth the text of article II, section 5 of the Iowa Constitution). The Iowa constitutional provision to which the Cullison court refers is, however, not article I, section 8, but rather article II, section 5, see id.., which strips voting rights from individuals convicted of infamous crimes, see generally Chiodo v. Section 43.24 Panel, 846 N.W.2d 845 (Iowa 2014). Thus, Cullison discusses three constitutional provisions: the Fourth Amendment, its necessary *530 constitutional companion, the Fourteenth Amendment, and article II, section 5 of the Iowa Constitution. According to the majority, Cullison’s holding is not under any of these provisions, odd as it may seem.

. Baldón dealt with a consent provision in a parole agreement. See 829 N.W.2d at 789. As properly noted by the majority in that case, "[t]he United States Supreme Court has not addressed the specific question whether a parole agreement executed by a parolee constitutes valid consent to support a waiver of Fourth Amendment rights.” Id. at 792.